1          IN THE UNITED STATES DISTRICT COURT

2             MIDDLE DISTRICT OF NORTH CAROLINA

3   UNITED STATES OF AMERICA,          )
                                       ) Case No. 1:13CR47-1
4       vs.                            )
                                       ) Greensboro, North Carolina
5   STANLEY SCOTT PORTER,              )
                                       ) July 11, 2013
6       Defendant.                     )
    _____) 3:16 p.m.

7

8              TRANSCRIPT OF SENTENCE - VOLUME 1
         BEFORE THE HONORABLE WILLIAM L. OSTEEN, JR.
9                  UNITED STATES DISTRICT JUDGE

10  APPEARANCES:

11  For the Government:   FRANK JOSEPH CHUT, AUSA
                          Office of the U.S. Attorney
12                        101 S. Edgeworth Street, 4th Floor
                          Greensboro, North Carolina 27401
13

14  For the Defendant:    DAVID B. FREEDMAN, Esq.
                          Crumpler Freedman Parker & Witt
15                        301 N. Main Street, Suite 1100
                          Winston-Salem, North Carolina 27101
16
                          JAMES F. WYATT , III
17                        Wyatt & Blake, LLP
                          435 E. Morehead St.
18                        Charlotte, NC 28202-2609

19                        ROBERT A. BLAKE , JR.
                          Wyatt & Blake, LLP
20                        435 E. Morehead St.
                          Charlotte, NC 28202-2609
21

22  Court Reporter:       Joseph B. Armstrong, RMR, FCRR
                          324 W. Market, Room 101
23                        Greensboro, NC  27401

24            Proceedings reported by stenotype reporter.
         Transcript produced by Computer-Aided Transcription.
25

                US v. Porter - Sentence, Vol 1 - July 11, 2013

P R O C E E D I N G S

1          (At 3:16 p.m., proceedings commenced.)

2          (Defendant present.)

3          MR. CHUT:  Good afternoon, Your Honor.

4          THE COURT:  Good afternoon, Mr. Chut.

5          MR. CHUT:  Your Honor, this is United States of
America versus Stanley Scott Porter, 1:13CR47-1.  Mr. Porter is
represented by Mr. Freedman, Blake, and Wyatt, and it's on for
sentencing, Your Honor.

10          THE COURT:  All right.  It looks like my 15-minute
break ran to nine.  Is everybody here?  Yes, all right.  Who's
going to be speaking --

13          MR. FREEDMAN:  As to different issues, we all may be
speaking at some point, Your Honor.

15          THE COURT:  All right.  Well, I'll start with you
then.  Are you and Mr. Porter ready to proceed?

17          MR. FREEDMAN:  Yes, Your Honor.

18          THE COURT:  And have you received a copy of the
presentence report and reviewed it with Mr. Porter?

20          MR. FREEDMAN:  Yes, Your Honor.

21          THE COURT:  Are there any objections?

22          MR. FREEDMAN:  There is one objection.

23          THE COURT:  All right.  That's the four-level
adjustment under 2L2.1(b)(3).

25          MR. FREEDMAN:  That's correct, Your Honor.  We filed

1  a position paper on that for the Court.

2          THE COURT:  Any other objections?

3          MR. FREEDMAN:  No, Your Honor, that's the only

4  objections based on the presentence report.

5          THE COURT:  All right.  Mr. Porter, let me ask you.

6  Have you reviewed the presentence report with Mr. Freedman --

7          THE DEFENDANT:  I have.

8          THE COURT:  -- or with your attorneys?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  And do you generally agree with the

11  report with the exception of the objection that's been raised

12  on your behalf?

13          THE DEFENDANT:  I do.

14          THE COURT:  All right.  Mr. Chut, the Government's

15  filed a sentencing pleading agreeing with the defendant on the

16  lack of applicability of the four-level adjustment in this

17  case, is that correct?

18          MR. CHUT:  Yes, Your Honor, that is correct.

19          THE COURT:  All right.  Well, in light of everyone's

20  agreement, I am inclined to sustain the objection and remove

21  the calculation, but, Mr. Chut, I'll ask both parties this --

22  Mr. Freedman, maybe I'll start with you.  The plus four set out

23  in 2L2.1(b)(3)(4) requires the application of the four-level

24  increase -- I'm drawing a blank on the language -- the visas

25  used in connection with another felony offense.

1          MR. FREEDMAN:  The visas facilitates.

2          THE COURT:  Facilitates, and this is an unusual case

3    in that there's a but for relationship.  If not but for the

4    fraudulent visas, we wouldn't have -- or the visas, we wouldn't

5    have the money laundering, but there's, I think, a relatively

6    strong argument that the visas didn't necessarily facilitate

7    the other offense, the commission of the money laundering,

8    because essentially the money -- by the time the money

9    laundering occurs, the visa fraud has been completed if you

10   look at it in a step-by-step process.

11         On the other hand, what I was looking at before here

12   is the Information charged a violation of 18 USC Section, I

13   think, 1526(a) -- let's see if I can find that statute.  Is it

14   1526?

15         MR. FREEDMAN:  1546, Your Honor.

16         THE COURT:  1546(a).  It looked to me like he's

17   charged under the provision that states:  "Whoever when

18   applying for an immigrant or nonimmigrant visa, permit, or

19   other document required for entry into the United States or for

20   admission to the United States, a person -- no, that's not it.

21   "Whoever knowingly makes under oath or is permitted under

22   penalty of perjury knowingly subscribes as true any false

23   statement with respect to a material fact in any application,

24   affidavit, or other document required by the immigration laws

25   or knowingly presents any such application which contains any

such false statement or which fails to contain any reasonable

basis in fact," et cetera, et cetera.  That looked to me like a

provision.

So one of the things that concerned me somewhat in

looking at an H-2B fraudulent process, the false statements

were made in connection with the H-2B visa process.  As I

understand what occurred here, once the process was completed

and approval was given for immigrants to enter the United

States pursuant to those visas, Mr. Porter and his companies

then, in effect, used those immigrants for staffing at other

businesses other than what had been applied for.

And here, under that four-level increase, the

passport or visa was to be used to facilitate the commission of

a felony offense, why wouldn't that apply with respect to the

then illegal entry into the United States of these individuals?

MR. FREEDMAN:  Your Honor, while I can address this

issue, this was the issue Mr. Wyatt was going to address with

the Court, so I am going to refer that to Mr. Wyatt.

THE COURT:  Mr. Wyatt -- we're not bound under the

guideline, to make the question clear, to just the money

laundering offense, which is where the arguments have been

directed.  It seems to me that there are other felony offenses

that are committed as a part of this, that is, the illegal

entry into the -- or the illegal visa application that would

constitute other felony offenses for which the visa was used to

1  facilitate -- the visas themselves were used to facilitate

2  those offenses.

3       MR. WYATT:  Your Honor, under this guideline

4  provision, 2L2.1(b)(3) specifically requires that the passport

5  or visa be used to facilitate a non-immigration felony offense.

6  In the cases we have cited to the Court, it indicates that the

7  actual process, the H-2B process, in which the immigration and

8  the passport visa violation occurs would not be considered a

9  non-immigration offense.

10      And then in addition to that, Your Honor, the case

11 law we have cited to the Court indicates that the passport or

12 visa has to be used with a separate offense in order for that

13 enhancement to apply.  It is a four-point enhancement.  It is a

14 very significant enhancement in light of the base offense

15 level, and that is why the guideline is structured as it is to

16 apply to a non-immigration separate offense.  The *Cabrera* case,

17 Your Honor, and the *Polar* case both indicate -- in that case

18 the enhancement was applied because there was a separate,

19 independent non-immigration offense in which the passport or

20 visa was, in fact, used.  In the *Cabrera* case, for example, the

21 passport or visa was used as a false identification in

22 connection with a completely separate drug offense.  That was a

23 case out of this district.

24      THE COURT:  You're right.  This is what happens at

25 the end of the day sometimes.  But I saw it as a step-by-step

1  process.  One, immigrants enter the country illegally.

2  We'll -- under the strict language of the guideline, that

3  applies.  But once they're here, aren't they -- do we draw

4  Social Security and various other things from their paychecks?

5           MR. WYATT:  Well, Your Honor, there are other

6  consequences of immigrants being here in the United States, and

7  in this case each of the individuals who applied for the H-2B

8  visas and came here were employed, did pay taxes, and all of

9  that was done properly.  The issue here is the fact that --

10          THE COURT:  Except for the fact they even shouldn't

11 have been here to begin with.

12          MR. WYATT:  Well, and that is subsumed within the

13 offense, and this enhancement applies to additional conduct

14 outside of that offense.  That's what the cases that we cited

15 hold.  Additionally, there's a number of cases that involved

16 either fraudulent conduct within the immigration context or

17 additional fraudulent conduct in which this enhancement was not

18 applied.

19          And so if the Court looks at those cases, they

20 clearly stand for the proposition that there has to be an

21 independent use of this visa or passport in order for this

22 enhancement to apply and an additional affirmative action that

23 constitutes a separate felony offense.

24          THE COURT:  Okay.  So on this offense of conviction

25 in this case, I have the basic -- we'll call it the basic

immigration scheme, as outlined here, to make these false

statements to obtain these visas for H-2B workers.  Then we

have individuals coming across the border pursuant to the

permission granted under those H-2B visas.  We then have those

individuals -- let me ask it this way.  I mean, as I understand

it, some of the false statements, including using names to act

as placeholders for individuals, what's the evidence that the

individuals who actually came over were at least of the same

name or the same individual that the original H-2B visa was

issued?

         MR. WYATT:  Well, your Honor, I think the evidence in

this case will show that the individuals who came over were the

individuals who were identified.  The false statement that's

alleged in this case is that an application and I-129 Form was

filed or a 9142 Form, which indicated that there was a need for

a certain number of H-2B immigrants to come over, and that need

was not a legitimate need as stated at that time.

         MR. CHUT:  Your Honor, I apologize, I thought that

was very safely off.  I apologize, Your Honor.

         THE COURT:  All right, Mr. Chut.  I'm not going to do

anything at this time, but if you want to bring it in, it has

to be silent.

         MR. CHUT:  Yes, Your Honor.

         MR. WYATT:  Your Honor, in addition to that, Section

2L2.1(b)(1) --

1          THE COURT:  All right.  Hold on just a second.

2     Paragraph 8 of the presentence report said the defendant

3     submitted petitions which included the use of placeholder

4     names, overstatement of temporary need, which goes to your

5     point, fictitious addresses showing the actual physical

6     location of foreign -- fictitious addresses showing the actual

7     physical location of foreign workers, misstated wages -- no,

8     excuse me -- created bogus businesses.  At least with respect

9     to placeholder names and fictitious addresses, it looks to me

10    like we're going a little bit beyond a need-based fraudulent

11    statement, and we're getting into information that would either

12    mislead as to who the individual was -- a placeholder name in

13    my mind means they used one name to get the visa without regard

14    to who it was actually coming.  Am I misreading that?

15         MR. WYATT:  Well, Your Honor, with regard to

16    paragraph 8, I believe that is information that came from a

17    confidential informant.  In terms of the actual evidence as

18    developed, I believe that the false statement was the statement

19    for need in the I-129 and the 9142 application and that the

20    people who then came here were, in fact, the individuals who

21    came over, and then they were subsequently employed.  The

22    problem was, of course, they were not employed at the

23    Winterscapes locations but were employed at golf courses or

24    other locations on the coast which were not authorized under

25    the visa.

1          THE COURT:  So you disagree with the facts set forth

2   in paragraph 8?

3          MR. WYATT:  Well, Your Honor, in terms of what is

4   charged in this conduct and what the evidence shows.  The

5   evidence shows that the false statement was the statement of

6   need on the applications.

7          THE COURT:  No false statements as to the names of

8   the visa holders.

9          MR. WYATT:  I believe Mr. Chut can address that, but

10  I don't believe that is the case, Your Honor.

11         THE COURT:  All right.  Mr. Chut?

12         MR. CHUT:  Your Honor, may I confer briefly?

13         Your Honor, prior to 2009, placeholder names could be

14  used that didn't match.  From 2009 on, they had to list actual

15  real human beings.

16         THE COURT:  So what happened here?

17         MR. CHUT:  For the 2009 application, Your Honor, the

18  Government's understanding is based on the evidence those are

19  the actual people that were then petitioned for, then, of

20  course, falsely because they were not going to go to work at

21  the mountains.

22         If I may further address that issue, Your Honor, that

23  Your Honor has brought up, the Government's position, however,

24  is that is -- and, Your Honor, just in general, the Government

25  has an obligation to present or agree to enhancements that I

US v. Porter - Sentence, Vol 1 - July 11, 2013

1  think the evidence would support.  The Government's position on

2  that, Your Honor, that's part of the visa fraud, the

3  immigration crime.  One reason the Government has not supported

4  this enhancement, Your Honor, is reading the case law and

5  looking at the face of the enhancement itself, there's not a

6  huge case law on this, but it's fairly clear in each of these

7  cases that there's a separate non-immigration felony committed

8  using the visas.

9          In this case, Your Honor, while the Court is

10 certainly correct there are other immigration crimes

11 committed -- for example, Mr. Porter could be charged with a

12 Title 8 offense for trafficking in illegal aliens by bringing

13 these folks in knowing they weren't going to go to this

14 particular location.  I think the evidence, Your Honor, is in

15 sufficient support to show there's a separate -- they can be

16 used to facilitate a separate felony.  The cases do bear on

17 situations using like, for example, fake visa stamps to get

18 false IDs, using the visas to facilitate drug trafficking.  I

19 did not find any cases that really could show the application

20 in this particular instance, Your Honor, and I would view --

21         THE COURT:  Let me go back to your original answer.

22 The beginning of that sentence says, "The investigation

23 revealed that from at least May 13, 2008, continuing up to

24 October 14, 2010."  You say in the 2009 application, the

25 placeholders names were the real -- the actual individuals who

1  came here to work?

2         MR. CHUT:  Yes, Your Honor.

3         THE COURT:  What about 2008?

4         MR. CHUT:  2008, Your Honor, they potentially were

5  not the people.  They were just placeholders to secure a place,

6  Your Honor, that's correct.

7         THE COURT:  So we just use a name and then later find

8  an individual to come across the border on the visa?

9         MR. CHUT:  Yes, Your Honor.

10        THE COURT:  Mr. Wyatt?

11        MR. WYATT:  Yes, and that initial part of that

12  process, Your Honor, would be part of the immigration, and this

13  guideline does require a non-immigration felony in order to

14  support it.  The people who were actually crossed were the

15  people who were crossed, Your Honor.

16        THE COURT:  Who were what?

17        MR. WYATT:  The people who were actually crossed were

18  properly identified by their names when they crossed into the

19  US in order to --

20        THE COURT:  I mean, if they have -- if I'm

21  understanding correctly, and, again, that's why I ask the

22  questions to make sure I understand the facts, from 2009

23  forward, the names used were legitimate names.

24        MR. WYATT:  Correct.

25        THE COURT:  For 2008 applications, there are false

1   names used to acquire the visas, placeholder names.

2           MR. WYATT:  Well, Your Honor, they are placeholder

3   names in order to uphold the number requested in the I-129 form

4   or the 9142 form, but then when the person actually crosses,

5   there's a separate list, and the person who has actually

6   crossed, in fact, that person, the person who was approved

7   at the Consulate and then came to the United States.

8           THE COURT:  Was that person being -- what person, the

9   person's whose name was given to Immigration to secure the

10  visa, or the person who was actually crossing the border?

11          MR. WYATT:  In 2008, Your Honor, the person whose

12  name was given to have the approval for the 9142 and the I-129

13  could have been placeholder names, but then there is an

14  additional process of actually getting the visa and crossing

15  the border.  Whoever was identified in the Consulate as Joe

16  Smith was Joe Smith, and Joe Smith was the person who came to

17  the United States.  That's what the process required at the

18  time, Your Honor.  And I think what Mr. Chut is saying is in

19  the subsequent year, the name had to be in the I-129 form, and

20  that had to be the person who was identified and crossed, and

21  that was accurate there.  So for both years, he complied with

22  the procedures.

23          THE COURT:  So in 2008, you could use anybody's name,

24  get the visa; and then once the visa had been issued, if

25  somebody else wanted to cross the border, they could -- the

visa was reissued under another name.

MR. WYATT:  That is my understanding, Your Honor, that at that point the visa is issued, and then the person crosses.

THE COURT:  Mr. Chut?

MR. WYATT:  So that would be an additional reason why this guideline -- this enhancement is not justified by this guideline because the guideline does require a separate non-immigration felony.

THE COURT:  Mr. Chut?

MR. CHUT:  In terms of the placeholders, Your Honor, in 2009 you could actually put "unnamed worker" on also, Your Honor.  There was a name requirement in 2008.

I will note there's no evidence that anyone crossed under a false name.  In fact, you can track -- part of Mr. Porter's problems were that you could track these workers by the fact they had the application number on their visas, the petition numbers.  So they -- there's no evidence --

THE COURT:  So what Mr. Wyatt is saying is correct. You could use any name to secure the issuance of the visa in 2008; and then if you applied under the name Joe Smith, for example, and it's approved, Joe Smith doesn't necessarily have to enter the United States, the visa could be issued to someone else.  It was just a visa available?

MR. CHUT:  That's my understanding also, Your Honor.

In 2009, you could put down "unnamed worker" on the petition.
And either way, Your Honor, the Government's position also
would be that this rolls into basically an immigration offense
in terms of the enhancement.

        THE COURT:  So you don't consider any placeholder
name representations to have been false or fraudulent in this
case?  I mean the sentence says:

        "The investigation revealed that from at least
        May 13, 2008, continuing up to October 14, 2010, the
        defendant was involved in submitting petitions which
        contained false statements and representations.  The
        defendant submitted petitions which included the use
        of placeholder names, overstatement of temporary
        need on behalf of customers, provided fictitious
        addresses showing the actual physical location of
        farm workers, misstated wages, and occupational
        classifications, created bogus businesses, and
        discouraged US workers from applying for and taking
        advertised jobs."

        Is that correct or incorrect?

        MR. CHUT:  Placeholder -- it's correct, Your Honor.
As to placeholder names, Your Honor, that could or could not be
fraudulent.  I'm not offering evidence that it was fraudulent
necessarily, Your Honor, since that was at the time a fairly
standard practice in the industry, as I understand it.  I

1  certainly agree with the rest of the sentence, Your Honor.

2        MR. WYATT:  Your Honor, and all of that would be

3  subsumed within the immigration process and are all steps

4  related to the filing of the 9142 or the 750 at the time, the

5  second year the 9142, and then the I-129 form.  That is why

6  this enhancement would not be applicable.

7        THE COURT:  Ultimately, Mr. Wyatt, I still come back

8  to my original comment.  I agree with the parties, I think, in

9  the end that the plus four does not apply.  I've got a

10 guideline adjustment that says more than 100, you add X number

11 of levels, and we've got 250 here.  I've got in this

12 presentence report, take off the plus four, but I've still got

13 what appears to me other conduct that is substantial.

14       Now, I'm about to become convinced that with -- even

15 though the presentence report says -- or at least suggests that

16 placeholder names are false statements and representations,

17 everybody seems to be in agreement that you could use whatever

18 name you wanted to to apply for the visa back in 2008; and then

19 if the visa was issued, whoever was available to come across

20 the border could come across the border and work under that

21 visa, and there's nothing false or fraudulent about that

22 practice at that particular time.  It was only in 2009 that the

23 name originally submitted had to match the name for the visa

24 that was issued.  And so the use of placeholder names was not

25 in 2008 a false or fraudulent practice.  Correct, Mr. Chut?

1           MR. CHUT:  Yes, Your Honor.

2           THE COURT:  All right.  Let me see Probation up here

3    for just a minute.

4           (Bench conference with probation.)

5           THE COURT:  All right.  Then I will adopt the

6    presentence investigation report with the following

7    modification, that is, with respect to the calculation of the

8    advisory guideline calculation, I will remove the 2L2.1(b)(3)

9    four-level adjustment finding that here, given the evidence

10   that's presented and arguments of counsel, that that adjustment

11   does not apply in this case.  As a result the advisory

12   guideline calculation -- well, first, neither count of

13   conviction carries a mandatory minimum sentence.  The advisory

14   guideline calculation is as follows:

15          A total offense level of 18.

16          A criminal history category of I.

17          A guideline imprisonment range of 27 to 33 months.

18          A supervised release range of one to three years.

19          A fine range of 6,000 to $60,000.

20          And a special assessment of $100 as to each count is

21   mandatory.

22          Mr. Freedman or Mr. Wyatt, will there be any

23   additional evidence on behalf of Mr. Porter?

24          MR. FREEDMAN:  No, Your Honor.

25          THE COURT:  Mr. Chut, any additional evidence on

1  behalf of the United States?

2          MR. CHUT:  No, Your Honor.

3          MR. FREEDMAN:  We would like to -- when we get to the

4  next portion about the motion that the Government's filed, we

5  would like to approach the bench just briefly.

6          THE COURT:  All right.  Let me ask one more question

7  about the presentence report.  The financial section of the

8  presentence report at page -- beginning at paragraph 51, I'm

9  unable -- I've got what looks like current salary and expense

10  information on page 15, but I don't see any income information

11  for -- after 2000, really going back to 1990 the last time I

12  see any income information.

13          Recognizing that no one's going to -- there's no

14  additional evidence in the case, it kind of leaves me a little

15  bit at a loss here as to what Mr. Porter may have been making

16  in terms of the businesses that he was operating, at least in

17  assessing the reasonableness of his $300,000 forfeiture and the

18  need for a fine in this case, if at all.

19          Mr. Chut, do you have any thoughts about that?

20          MR. CHUT:  In terms of either a fine, Your Honor, or

21  sort of the forfeiture which has been ordered?

22          THE COURT:  Either one.  The only thing that I have

23  that gives me any information, even potentially, about the

24  assets of the business or the earnings of the business of this

25  Carefree Service Company listing at $972,000, and I don't know

whether that's all staffing income -- I mean, staffing assets.
He owns other properties, so I don't know what -- I can't be
100 percent certain what's running through here, through that
company.  And so I see that Mr. Porter has forfeited $300,000
to the United States, but I don't know whether that's 1 1/2
times the ill-gotten gains from this fraud, whether that's half
of the ill-gotten gains from the fraud.  I don't have anything
to use to evaluate -- I've got plenty of assets to say he's got
assets to pay a fine, but determining whether he should and, if
so, how much, I'm a little bit at a loss because I don't see
any financial information on what was committed here.

       MR. CHUT:  In terms of the basis for the forfeiture,
Your Honor?

       THE COURT:  Either the proceeds from the fraud --
I've got a $14,000 plea in the case, but in terms of proceeds
or earnings.

       MR. CHUT:  Your Honor, if I may consult, I may be
able to put on evidence on that right now, Your Honor, and
address the Court's concern, if I may consult briefly, Your
Honor.

       MR. WYATT:  Your Honor, I may be able to address
that.  Winterscapes is the entity that's the subject of the
Bill of Information, and I think the net profit from
Winterscapes in each of the years was approximately $75,000.
So I believe the forfeiture amount is about approximately twice

1 the amount of the profit.  That's not the gross revenue, but

2 the profit from that entity.

3          THE COURT:  Yeah, and what was Mr. Porter paid from

4 Winterscapes during that time?

5          THE DEFENDANT:  Essentially all those proceeds, Your

6 Honor.

7          MR. CHUT:  And, Your Honor, the forfeiture amount was

8 based on an estimate of the profit which was about half of the

9 gross proceeds, Your Honor, which was about $600,000.

10          THE COURT:  All right.  Mr. Freedman, did you want to

11 come up to the bench first?

12          MR. FREEDMAN:  Yes, Your Honor.

13          (Bench conference as follows:)

14          MR. FREEDMAN:  Your Honor, I think the extent of his

15 cooperation is very extensive and still ongoing.  I'm sure, as

16 you can see from the pleadings from Mr. Chut, we were just

17 concerned about stating anything on the record other than

18 what's been filed under seal for fear of damaging the

19 Government's investigation in any fashion.  I just wanted to

20 make sure the Court felt fully briefed as to the extent of his

21 cooperation and what was going on.

22          THE COURT:  Yeah, I mean, it looks pretty extensive

23 at this point in time.  The Government's recommended

24 20 percent.  I assume he's still testifying at the end of this

25 month before a grand jury?

1    MR. CHUT:  Yes, Your Honor.

2    THE COURT:  Does 20 percent take into account that

3 anticipated testimony?

4    MR. CHUT:  Yes, Your Honor, although he may -- well,

5 it hasn't happened yet, Your Honor, so he's definitely going to

6 testify.  I assume he's going to proceed without at this point

7 basically including --

8    THE REPORTER:  I'm sorry, I can't hear you.

9    MR. CHUT:  That would include the 20 percent, and

10 there is a possibility of coming back under a Rule 35 setting

11 for more -- it's a little bit unusual.  I mean, it's not that

12 unusual.  There's a strong possibility he will eventually

13 testify at a criminal trial, and that will need to be dealt

14 with in a Rule 35 setting.

15    MR. FREEDMAN:  And that criminal trial may not go on

16 until --

17    MR. CHUT:  Next year.

18    MR. FREEDMAN:  -- next year.

19    THE COURT:  And so what are you asking?

20    MR. FREEDMAN:  Well --

21    THE COURT:  I know what you're asking.  What you're

22 saying is we don't want him to get a sentence and then come

23 back with a further reduction --

24    MR. FREEDMAN:  No, no, we understand -- right, right.

25 No, we understand I believe under these facts everything will

1  have to be addressed in total under Rule 35.  It's just -- but

2  his full cooperation obviously won't come to fruition until

3  then, so I understand that.  I know the Court can't give

4  cooperation based on what may happen, but it could be six or

5  eight months down the road.

6       THE COURT:  I don't really have much doubt Mr. Porter

7  will finish up his cooperation, and my comment earlier

8  notwithstanding, I would prefer not to impose an active

9  sentence only to see at the end of his sentence the Government

10  come back and say he's entitled to further reduction which

11  would have taken him down to probation or something like that.

12  We'll talk about that later.  I'm not -- we're going to get

13  this -- get some issues addressed.

14       I don't see.  I mean, trying to wait until these

15  other prosecutions are done is tantamount to an indefinite

16  continuance.  I'm willing to push things out at least a little

17  bit either in terms of finally imposing a sentence or reporting

18  dates or other things to give us some time to see what happens.

19  I think at this point the longest reporting date I've given is

20  about eight months, but I'm not averse to stretching out a

21  reporting date for several months to see what happens.

22       MR. FREEDMAN:  Yes, Your Honor.  You've addressed our

23  exact concern.

24       MR. CHUT:  And, Your Honor, the Government's concern

25  is that this is a very complicated case.  We've literately had

agents in five states corroborating his evidence, and he's been
very -- like I said, it's a complicated case.  He's been a
Rosetta Stone in terms of some of the activities.  He's given
us very specific information, which we've been able to
corroborate, but especially at this time in sort of Government
finances it's required a lot of travel by agents, and it's
perhaps not moved as fast as I would like, but we have been
corroborating, and it's been a heavy kind of logistical lift
for the agencies.  To his credit, what he's given us has panned
out, Your Honor.

          MR. FREEDMAN:  And not just in this district as well,
possibly in the Western District of Virginia as well.

          THE COURT:  This H-2A and H-2B stuff extends -- I
mean, here I think you've got South Carolina, North Carolina,
and various other employers participating in the staffing, so
it's spread out.

          MR. FREEDMAN:  Your Honor, in light of that, would
the Court wish to defer argument as to potential variance until
the Court would have all issue about cooperation?

          THE COURT:  Variance departure and what?

          MR. FREEDMAN:  Variance as to the 3553(a) factors.
Would the Court prefer -- whatever the Court's preference.

          THE COURT:  All right.  Step back.  I will address
some things in open court.  It may make things a little
clearer --

```
1           MR. FREEDMAN:  One other matter.  This doesn't
2  involve -- that will help Mr. Chut at the bench.  We had until
3  tomorrow to file a Rule 29 for Mr. Hovis.  I'm going to be
4  pleading Mr. Hovis in state court tomorrow.
5           THE COURT:  And the Government's going to dismiss.
6  This is Terry Meinecke's case --
7           MR. CHUT:  Yes, Your Honor.
8           THE COURT:  -- that was tried that --
9           MR. CHUT:  Yes, Your Honor.
10          THE COURT:  -- resulted in a mistrial.
11          MR. CHUT:  Yes, Your Honor.
12          THE COURT:  So are you comfortable standing in for
13  him --
14          MR. CHUT:  Yes, Your Honor.
15          THE COURT:  -- for the moment?
16          MR. FREEDMAN:  Yeah, we're going to -- and that will
17  take care of it.
18          THE COURT:  I'll extend the time to file the Rule 29
19  briefs for another week.
20          MR. FREEDMAN:  Yes, Your Honor.  I'll have it
21  resolved tomorrow.
22          THE COURT:  Are you okay with that?
23          MR. CHUT:  Yes, Your Honor, I am.
24          THE COURT:  All right.  You're extended for seven
25  days.
```

Case 1:13-cr-00047-WO  Document 35  Filed 05/29/14  Page 24 of 50

1            MR. FREEDMAN:  Thank you, Your Honor.

2            (Bench conference concluded.)

3            THE COURT:  I'll tell you what, let me kind of pull

4  my thoughts together after our discussion here at the bench.

5  Give me about 10 minutes, and I'll come back.  Is this the last

6  one on this afternoon?

7            MR. CHUT:  Yes, Your Honor.

8            THE COURT:  Let's take about a 10 -- we'll stand at

9  ease for 10 minutes.

10           (At 3:50 p.m., break taken.)

11           (At 4:01 p.m., break concluded.)

12           THE COURT:  Mr. Chut, let me ask you.  Mr. Wyatt

13  says, and Mr. Porter confirms it, the $300,000 forfeited more

14  or less reflects the net profits to Winterscapes during this

15  period of time.  How did the Government come up with that

16  figure?

17           MR. CHUT:  Your Honor, that was calculated by

18  Ms. Klauer working with Mr. Guerrini who is consultant for

19  Department of State based on the evidence we've obtained during

20  the investigation and then sitting down with the defendants and

21  reviewing that evidence and agreeing on a figure for the

22  forfeiture.  I can call Mr. Green, Your Honor, if Your Honor

23  wants to hear evidence on that process.

24           MR. WYATT:  Your Honor, that would be twice the

25  amount of profits because the amount of profits was 75,000 per

1   year, which would be 150,000 for the two years, and then the

2   $300,000 forfeiture.  It's four calendar years, but two seasons

3   of workers, Your Honor.

4          THE COURT:  All right.  Let me hear from the parties

5   then -- if there's no additional evidence in the case, let me

6   hear from the parties at this point as -- without regard to the

7   5(k) or the motion that's been filed by the Government, let me

8   hear from the parties as to whether or not -- what sentence is

9   sufficient but not greater than necessary taking into

10  consideration the advisory guideline calculation as well as all

11  other factors set forth under 18 USC Section 3553.  I think it

12  might be easiest to first determine a starting point; and then

13  once I've done that, we'll come back and see where we are on

14  the 5(k).  Does that make sense?  Mr. Freedman, do you

15  understand that?  Mr. Chut?

16         MR. CHUT:  Yes, Your Honor.  Thank you, Your Honor.

17         MR. FREEDMAN:  Well, Your Honor, we would ask for a

18  variance obviously under 3553(a) factors.  We've listed very

19  extensively -- Mr. Blake prepared a written document for the

20  Court stating all the reasons we believe he should receive a

21  sentence significantly below the guideline range.  We would ask

22  whatever you start at that you start at the low end of the

23  guideline range for the reasons identified by the Probation

24  Office.

25         Mr. Porter is 62 years old.  No blemishes on his

record of any kind.  He, as you can see from the presentence report and from the documentation that we filed, has spent his whole life being an extremely hard worker.  He was working in college creating a co-op that he did at that point working as an accountant working for South Moore, coming back home to run the family Christmas tree business back in western North Carolina when his father became ill, turning that into a profit, and engaging in the various businesses.  He's been in Boone since that time.  So he's a very hard working person, and I know you have other hard working people come before the Court, but you have a lot of people who are not like that, and his record is sort of unblemished in that regard.

He is an excellent father.  He has two sons, 22 and 16, and the 16 year old he provides great guidance for.  At this time he splits custody with his wife, and I believe the Court -- we submitted a letter from his son that I'm sure the Court has reviewed extensively as well.

You can also see he's been very active in charitable work in Boone, Habitat for Humanity and a number of other charitable organizations.  He's a hard working --

THE COURT:  I mean, how does something like this happen, Mr. Freedman?  I mean, you have somebody, you're correct, who has an unblemished record, obviously well-respected within the community, and this is just -- it's like got in the back room of the office and started making

1    stuff up.  Discouraged American workers from applying for jobs?

2            MR. FREEDMAN:  Your Honor, I believe there would be

3    some question about that.  I mean, there's no question he

4    provided false documentation, so we're not questioning that.

5    We did have evidence and did provide -- we met with the agents

6    that we have done on a number of occasions where he was

7    advertising for work for American workers.  So while we don't

8    want -- we didn't want to get into all the nuances because

9    we -- he's pleading guilty, and he's admitting his guilt.

10           I believe essentially, Your Honor, when this came

11   about, and this didn't -- as the Court will find out at some

12   point, I don't want to go too much into detail, this did not

13   come about in a vacuum where Mr. Porter just sort of dreamed

14   this up on his own.  Mr. Porter used various agencies over the

15   years that he worked with.  And to the extent I don't want to

16   get-go into any other aspects of the investigation, this was

17   something not necessarily done with Mr. Porter by himself or

18   only by Mr. Porter.

19           But, essentially, I believe --

20           THE COURT:  Well, I mean, even assuming that to be

21   the case, though, nobody did the applications for Mr. Porter,

22   correct?

23           MR. FREEDMAN:  Well --

24           THE COURT:  His company did.

25           MR. FREEDMAN:  There was a company working with him

1  to do the applications.

2          THE COURT:  ILMC.

3          MR. FREEDMAN:  Yes, Your Honor.

4          THE COURT:  And so are you contending Mr. Porter

5  didn't falsify information?

6          MR. FREEDMAN:  No, Your Honor, we are not.  Again,

7  there's no -- don't want to say that, Your Honor.  That's not

8  the case.  He falsified the information.  There was no question

9  Mr. Porter knew there was not the need for the amount of

10 workers that were requested for on these applications and that

11 where the workers would ultimately end up is not going to be in

12 the mountains but on the golf courses.

13         THE COURT:  All right.  Then let's go back to the

14 beginning statement that I went around with Mr. Wyatt on a

15 little bit.  The placeholder names was not false or fraudulent

16 activity.  The overstatement of temporary need on behalf of

17 customers was -- it sounds like everybody agrees that was

18 false.

19         MR. FREEDMAN:  Yes, Your Honor.

20         THE COURT:  Fictitious addresses showing the actual

21 physical location of foreign workers.

22         MR. FREEDMAN:  That was in conjunction, Your Honor,

23 with the placeholders, for the people that they were using as

24 placeholders for the people that they ended up bringing --

25 everyone who came over came over --

1          THE COURT:  Okay.  But listen carefully to this:

2     "Provided fictitious addresses showing the actual physical

3     location of foreign workers."  If he's misstating the need, and

4     the workers aren't going where represented, then any

5     representation as to where they're going to be working if

6     they're not going to be there, that's --

7          MR. FREEDMAN:  If it was listed, Your Honor, they

8     were going to Beach Mountain or Sugar Mountain to create snow

9     or whatnot, and they didn't did go there, that would be

10    correct.  That was not correct.

11         THE COURT:  Did Mr. Porter participate in that?

12         MR. FREEDMAN:  Yes, Mr. Porter did participate in

13    that.

14         THE COURT:  Okay.  "Discouraged US workers from

15    applying for and taking advertised jobs."

16         MR. FREEDMAN:  We would -- I believe if there was any

17    point of contention in all this between our position and the

18    Government's position, that would be -- we would contend that

19    was not the case.

20         THE COURT:  "Used the names and personal identifying

21    information of US job applicants on the recruitment sections to

22    purport that applicants had been interviewed and hired when, in

23    fact, they were not hired."  Was he using real US applicants

24    and saying they had been hired for positions?

25         MR. FREEDMAN:  I'll let Mr. Wyatt address that issue,

1  Your Honor.

2         MR. WYATT:  Your Honor, under the immigration

3  process, there is a procedure provided for by the immigration

4  laws where prior to applying for these visas for the H-2B

5  workers, you have to offer the jobs to American citizens.

6  There was a procedure specified in the law where you had to

7  place an advertisement, then workers would respond to that

8  advertisement, you would then interview those workers or offer

9  the workers who responded a job, and usually that job wouldn't

10 start for several months because of the time it would take to

11 actually apply through the H-2B process to get both the 9142

12 filed as well as the I-129 form filed.

13        I don't think there's any dispute in the evidence in

14 this case that the process that was required by the immigration

15 laws with regard to US workers was followed.  In some

16 instances, very few US workers responded to the ads, and in

17 some of those cases Mr. Porter's company would simply hire

18 those workers or offer them employment rather than interview

19 them because so few responded.

20        When it came time actually for them to report to

21 work, which may be several months later, some of those

22 individuals may have applied or may not have applied -- or may

23 have shown up or may not have shown up.  But I think in terms

24 of compliance with those laws, following those procedures in

25 terms of advertising, and in addition to Mr. Porter ILMC

1  handled part of that process, that process was followed.  In

2  2007, 2008 with the economy as it was, it was very hard to find

3  American workers, you know, and then later --

4           THE COURT:  Let me ask it very simply.

5           MR. WYATT:  Yes, sir.

6           THE COURT:  Did Mr. Porter represent to the United

7  States falsely that American workers had been hired when they

8  were not?

9           MR. WYATT:  I don't believe so, Your Honor.  The

10 false representation was the statement of need that justified

11 the amount of visas that were applied for for the foreign

12 workers.

13          THE COURT:  I mean, but doesn't that last sentence in

14 paragraph 8 at least suggest, if not state, that that's one of

15 the false representations made?

16          MR. WYATT:  Your Honor, I think on some occasions

17 what would occur is that there may have either been some

18 confusion about the responses in terms of offering a job or the

19 actual offering of the job, but the job -- they couldn't come

20 to the job until months later.  But it is a process that is

21 prescribed by the immigration laws and was followed in terms of

22 what those requirements were.

23          THE COURT:  So it's your position he never

24 represented that someone had been hired when they were not, in

25 fact, hired with respect to American workers?

1          MR. WYATT:  What would happen, Your Honor --

2          THE COURT:  There's a difference between hiring and

3    not showing up.  That's not false in and of itself.  But there

4    is a difference between saying you hired somebody when you

5    haven't.

6          MR. WYATT:  Well, Your Honor, what would happen is

7    when an applicant was interviewed or when they responded, then

8    his company would respond by letter if they didn't interview

9    them with an offer for a job.  It may have been that some of

10   those letters didn't get received.  You know, it may have been

11   some issue of communication there, but I don't think there's an

12   issue of Mr. Porter and the visa application saying, well, you

13   know, we went out and tried to interview US workers, and none

14   applied.

15         THE COURT:  No, I mean it's not applications, it's

16   flat out hired.  Did he represent to the United States that he

17   had hired American workers when, in fact, those applicants had

18   not been hired?  Falsely make that representation?

19         MR. WYATT:  I'm sorry for this answer, Your Honor,

20   but the way the process worked is prior to filing these 9142

21   and I-129 forms, the process had to be undertaken in which you

22   offered employment to American workers.

23         THE COURT:  Understood.

24         MR. WYATT:  That was usually done by publication

25   through a newspaper in the county.

1          THE COURT:  I understand that.

2          MR. WYATT:  Individuals would then respond to that.

3    Mr. Porter would then either interview them and determine if

4    they qualified -- and there were certain non-qualifiers, like

5    if they had a prior drug conviction, other things like that.

6    If they qualified, they would be offered a position of

7    employment, usually by letter.  The actual position of

8    employment didn't occur until several months later after his

9    companies had gone through the process of bringing the H-2B

10   workers.  So what was represented in the application process

11   was that they had interviewed these people, they had offered

12   them -- made offers of employment to them, the actual

13   employment date wouldn't be until the employer -- the company,

14   the client, wanted the worker there and wanted the H-2B workers

15   there, which was sometimes several months in the future.

16          So I think there may have been complaints that, well,

17   they sent us a letter of employment, but I didn't have a job

18   that day.  I didn't get to work until six months later, and I

19   can't wait six months for a job, and, therefore, that may have

20   been some of the confusion there.  But in terms of the

21   application process, you know, the process required offering

22   employment to the workers, the American workers, those offers

23   were made, and then there's a timing issue.

24          THE COURT:  I think we're talking past each other a

25   little bit.  I understand what you're saying, but I've got a

report here that says he used names and personal identifying information of US job applicants on the recruitment sections of ETA-9142 to purport that applicants had been interviewed and hired when, in fact, applicants were not hired. Does that statement of fact accurately represent a false or fraudulent representation that Mr. Porter made in this process? Yes or no, or if you can.

MR. WYATT: Your Honor, I guess we can answer that question to the best of our knowledge. It may be that the Government -- if the Government has additional evidence could present that to the Court to answer the Court's question. To my knowledge --

THE COURT: The evidence in front of me right now is this presentence report. I don't have the benefit of the discovery. So to the best of your knowledge.

MR. WYATT: To the best of my knowledge, the process occurred in the way I have related to the Court. Now, there's, you know, a little bit of semantics in the situation because what was required was a letter offering employment. That does not mean the job started that day because of the way the process was and because that job to an American worker had to be offered prior to filing the 9142 or prior to that 750 form and prior to filing the I-129 form and then prior -- actually crossing the H-2B workers, and that's when the work actually began.

```
1          THE COURT:  So your position then would be he never
2   falsely represented that he had hired somebody he had not, is
3   that correct?
4          MR. WYATT:  American workers.
5          THE COURT:  Um-hum, American workers.
6          MR. WYATT:  Yes, sir.  There were certainly -- there
7   were certainly a large number of Americans who were hired, and
8   to the best of our knowledge that's true, Your Honor.
9          THE COURT:  Mr. Chut?
10          MR. CHUT:  Your Honor, on that point, let me address
11   the Court's specific point.  The Government does have evidence,
12   and, Your Honor, I'm not -- I had not thought it relevant to
13   the sentencing and also weight of an issue.  There was evidence
14   that maybe one individual believed that he had been -- was
15   listed as being offered a job and did not believe he had been
16   offered a job.
17          THE COURT:  This doesn't say offered.  There's a
18   difference between offering and hiring.
19          MR. CHUT:  Correct.
20          THE COURT:  And I understand the difference between
21   offering, hiring, and start dates.  Those are terms of art.
22   I've got that.  But do you agree or disagree with that sentence
23   in the presentence report?
24          MR. CHUT:  Your Honor, there is evidence that
25   Mr. Porter -- at least one individual was listed as hired that
```

was not.  There is some play, though, Your Honor as Mr. Wyatt
has pointed out the difference.  That does not mean the United
States is concurring with them that there was not a terrible
impact on American workers.  That's a larger issue, Your Honor,
which I'll move on to.  But the United States has not offered
evidence on that individual that appears on the labor form as
being hired that never worked there.

THE COURT:  How am I supposed to fashion a sentence
in a case when I've got a presentence report that is not
objected to and about every fact in it is either incorrect or
qualified in some respects?

MR. CHUT:  Well, Your Honor, I think --

THE COURT:  This says applicants, not one, multiple.
You don't agree with that.

MR. CHUT:  I don't agree, Your Honor, that applicants
were listed.  Now, Your Honor, the PSR is correct on the impact
on American workers.  The way this process works is you --

THE COURT:  That's not what it says.  It says they
were listed as hired -- interviewed and hired when they were
not, in fact, hired, period, end of story.  Is that true or
false?

MR. CHUT:  That is true as to one and possibly two
workers, Your Honor.

THE COURT:  One, possibly two?

MR. CHUT:  Your Honor, based on our investigation.

1          THE COURT:  So what is it that Mr. Porter did that

2    was false in your mind, Mr. Chut?

3          MR. CHUT:  Your Honor, there's no question this a

4    massively false application.  This application process, the

5    Government of the United States allows foreign workers to come

6    in --

7          THE COURT:  Let me just say something.  I am well

8    familiar with the H-2A and H-2B programs.  If you don't believe

9    me, go read my decisions in *Growers versus Solis*.

10         MR. CHUT:  Yes, Your Honor.

11         THE COURT:  I'm familiar with both of them.

12         MR. CHUT:  Yes, Your Honor.  And I'm sorry, Your

13   Honor, if I suggested --

14         THE COURT:  What specifically did he do that was

15   false?

16         MR. CHUT:  He specifically told the Government of the

17   United States that there was a need for approximately 245 more

18   workers to work at two ski resorts as outsourced janitors one

19   year.  The year before he said there was a need for 150 Mexican

20   snowmakers on the mountains for a period from September through

21   the growth season knowing full well there was no need for those

22   jobs and that those workers would then go to South Carolina

23   where there was no test of the market for American workers and

24   go work at jobs the Americans would take.

25         So, Your Honor, that's what he did.  He falsely told

the United States Government there's a need for jobs knowing
those jobs, in fact, did not exist with the intention of using
those workers for completely different jobs in completely
different places at completely different times for the purposes
of basically gaming the system to get folks in under the caps,
Your Honor.

THE COURT:  Okay.  So we've got the numbers.

MR. CHUT:  Yes, Your Honor.

THE COURT:  He misrepresented the need.

MR. CHUT:  Correct, Your Honor.

THE COURT:  He didn't make a false statement with
respect to placeholder names.  Arguably, he submitted
fictitious addresses because he was representing they were
working in one place when he knew they were going to go to
another.

MR. CHUT:  Yes, Your Honor.

THE COURT:  He didn't misstate wages and occupational
classifications, except to the extent he represented there
would be a janitor at one place, and they were working
somewhere else.

MR. CHUT:  That is misrepresenting that, Your Honor.
The Government of the United States is letting these folks in
to either be janitors at the mountains or, in 2008, snowmakers.
Instead, they're working as landscapers in Myrtle Beach or in
Georgia.

1          THE COURT:  Did he discourage US workers from

2   applying for and taking the jobs?

3          MR. CHUT:  Yes, Your Honor.  Structurally, that is

4   inevitable, and there's two reasons why and why I may

5   respectfully disagree with my colleagues here.  But, one, how

6   can you advertise for Americans -- Americans for these jobs

7   when the jobs are fictitious?  The system exists, you say,

8   here's a job, and you can come take it.  If you --

9          THE COURT:  I don't know, Mr. Chut.  I mean, it's

10  beyond my comprehension that you could apply for a visa in one

11  person's name and send somebody else in after approval.  I

12  don't understand that process.

13         MR. CHUT:  Your Honor, that was a process the law

14  apparently had in place, Your Honor, so I can't speak in

15  defense or against that.

16         THE COURT:  I mean, it's a rhetorical question, I

17  understand.  I'm not administering the program.  I understand

18  that.  But not everything is readily self-apparent as to what

19  is fraud, what Mr. Porter did in this case, and what the extent

20  of the damage was caused by the criminal activity.

21         MR. CHUT:  The applications, Your Honor, the labor

22  application, which was then incorporated into the I-129, state

23  that they have tested the market for 150 snowmakers in '08 and

24  215 winter janitors in 2009.  The vast majority of those jobs

25  didn't exist.  So it's impossible to have some legitimately

1    looked for American workers for jobs that didn't exist.

2           Those workers are knowingly being sent to South

3    Carolina and Georgia to work on golf courses where the market

4    has not been tested for those workers.  Mr. Porter has

5    represented to the United States Government that the market's

6    been tested in Boone, North Carolina, you know, Banner Elk,

7    North Carolina, for snowmakers and janitors knowing those

8    workers were going to South Carolina and Georgia where the

9    market has not been tested for these Winterscapes workers.

10   That takes away American jobs.

11          And, Your Honor, I think the structure of this, the

12   fact that these are, quite frankly, fictitious jobs in North

13   Carolina for the vast majority, and certainly we've had 100

14   fictitious jobs in '08 and certainly 245 fictitious jobs in

15   2009.  They're not jobs you can offer to Americans because they

16   don't exist.  There's not 245 all-weather janitors in 2009.

17   When the folks do go to work, they're down in a market that's

18   not been tested for American workers, and they're working on

19   golf courses.  So the impact on American workers was very

20   substantial, Your Honor.

21          And these are -- Your Honor, these petitions, the

22   2009 petition in particular, is completely false.  If

23   Mr. Porter had said to the Government, hey, I want you to give

24   me 245 workers under designation of janitor so I can later

25   transfer them and get these workers in first because they're

1 under the cap, the Government of the United States would have

2 said, no, you cannot do that.  So this entire petition was

3 fraudulent.  The job's fraudulent.  The location's fraudulent.

4 Where they're going to go is fraudulent, and it's done for his

5 profit.

6          So, Your Honor, while I may appear to quibble about a

7 couple of phrases in the PSR, there is no quibbling about the

8 fact these are fraudulent petitions.  That would be the basis,

9 Your Honor, for my argument when it comes to my turn to talk

10 about the sentencing factors, Your Honor.

11          THE COURT:  Mr. Wyatt, do you agree with that?

12          MR. WYATT:  Your Honor, just to address Mr. Chut's

13 comments.  The petitions that were filed for Winterscapes,

14 which is the entity in the mountains, were false.  They

15 represented a need that did not exist.  In the first year, the

16 need that was represented was for 150 workers.  In fact, they

17 had a need for approximately 50 workers.

18          And going to the Court's deeper question, you have

19 Mr. Porter who's 62 years old, who's an outstanding citizen in

20 his community, who has no prior indication of engaging in this

21 conduct, why did this occur?  The fact is that the year prior

22 to the formation of Winterscapes, of course, Mr. Porter had

23 several other companies that staffed various golf courses on

24 the coast, and you have the cap, as the Court is probably

25 familiar from the *Solis* opinion.  The cap was hit before he had

his workers approved the year before, and it threw his business into a complete disarray because he couldn't get workers for clients he had had for five, seven, ten years because of the cap. And what happened in Winterscapes is in order to avoid that cap issue occurring again, there were applications filed that inflated the number of workers needed for Winterscapes so that those workers could be available if the cap is hit with regard to the applications for the other companies that serviced the coast.

What happened in the first year of Winterscapes is 150 workers were approved through an inflated statement of need. Fifty were legitimate because there were need for fifty workers in the mountain. And then what happened is that the cap hit in the winter of 2009, and so instead of the additional 100 workers going to Winterscapes working there then being transferred to the coasts, which would have been appropriate, they came in saying they were going to Winterscapes, and they went straight to the coast.

In the second year, there was a stated need of 250 workers, and the evidence would show that there was a need from the ski resorts of no more than eight or nine people. And when several workers were crossed in November of that year, they were stopped at the border. Questions were raised about the petition, about the fact that it said there were janitors needed up in the mountains -- 250 janitors needed for Beach

1  Mountain, and so no further workers crossed that year.  No

2  further workers crossed under that statement of need of 250

3  workers.

4          But to answer the Court's underlying concern, the cap

5  was a big issue.  This was a scheme that occurred to get around

6  the cap.  That was illegal.  Mr. Porter takes complete and full

7  responsibility for that.  He's trying to show his

8  responsibility by fully cooperating with the Government, by

9  paying all forfeiture and whatever fine this Court imposes.  He

10 knows it's wrong.  He broke the law.  But that's the background

11 for it, Your Honor.

12          THE COURT:  All right.  Well, that is helpful.

13          Now, in my mind -- maybe I'm wrong about this.  But

14 in my mind there is a difference in degree between things like

15 fraudulent placeholder names and that being the practice or

16 that being done lawfully for three of the four years of the

17 activity.  There's also a difference in my mind between

18 discouraging American workers from applying when, in fact, the

19 advertising and testing in the market is done for one set of

20 jobs, we get the visas and send them somewhere else.  That's

21 not -- in my mind that may be depriving American workers of

22 business opportunities, but it's not discouraging them from

23 applying for jobs, if I'm making myself clear.

24          There's also a difference in my mind between hiring

25 someone or extending an offer to someone for a job to start

some time in the future and then that individual not appearing

for that particular position.  That's different from

representing that you've hired Americans when, in fact, you

have not hired Americans.

And all of these facts in my mind are very

significant in determining the nature and circumstances of the

offense.  Did he make ten false representations?  Did he make

two false representations?  Did he discourage American workers

from applying for jobs?  Or by virtue of this scheme, as an

incidental result, did he affirmatively discourage American

workers from applying?  Or, as an incidental product of this

scheme, were American workers deprived of the opportunity to

apply for a job?  Did he use a false name to hold a place for a

visa which could result, at least in my opinion, in anybody

crossing the border later if the names are insignificant?

Because I do think there are businesses in Mexico that are

screening the workers to come up here to the United States, if

my recollection is correct of how this industry works to a

certain degree.  Those who qualify come to the United States.

But if that was the practice in 2008, and in 2009 forward there

were no place -- false or fraudulent placeholder names used,

those are significant factors in determining what sentence is

significant but not greater than necessary.

It sounds to me like to a certain degree that the

parties have -- they may not completely agree, but the parties

have some idea of what the sentence to be imposed in this case

should be, and perhaps they're not very far apart on where this

sentence should land.  But, ultimately, it's my responsibility

to determine a sentence that is sufficient but not greater than

necessary, and I just can't -- I can't do that based on facts

that are leading me in the wrong direction as to what

Mr. Porter did or did not do.

So this is what I'm going to -- what we're going to

do.  I don't know what the parties agree on, what they don't

agree on, but we're going to continue this sentencing hearing

for a period of at least six weeks.  The parties are instructed

to consult with each other, and within a period of at least --

of no more than four weeks, they are to report back to

Ms. Holly on a better explanation of the facts of this case to

allow me some opportunity to make a decision as to what

sentence is sufficient but not greater than necessary in this

case.

And having continued this, I'm going to tell both

sides that at this point in time, I am not satisfied that I

fully appreciate or understand the $300,000 forfeiture here.  I

heard a lot of numbers bandied around about net profits, but a

net profit calculation is virtually meaningless.  Gross profits

can be reduced any one of a number of different ways with costs

and expenses, and to talk in terms of net profits tells me

little, if nothing, about what a company was doing and what

kind of earnings were being derived.

So, Mr. Chut, to the extent Ms. Klauer had valid information, I'm going to ask that you share that with Ms. Holly to give her some idea of how these numbers were calculated because if, in fact, Mr. Porter has paid and forfeited an amount that's twice the amount of profits that he earned, that's a significant factor for me in determining at this point what sentence is sufficient but not greater than necessary. But if we've got 150 employees and 250 employees coming in, and those are being staffed out at wages of who knows, 8 or $9 an hour, and charged X number of dollars for those services, it seems to me you can get to 300,000 pretty quickly, but I may be wrong about that. But it is significant to me if Mr. Porter has voluntarily agreed to forfeit to the United States an amount that is twice the profits that he earned from this transaction.

I think I've made it clear what facts I want clarified. Mr. Chut, do you have any questions?

MR. CHUT: No, Your Honor.

THE COURT: Mr. Freedman, Mr. --

MR. WYATT: No, Your Honor, and we'll be willing to get with the Government, try to come up with stipulated facts, extensive facts, that we can give to Ms. Holly as well as establishing the legitimacy of the deductions relating to the gross revenue of Winterscapes and the calculation of that

 1  profit.

 2          THE COURT:  I mean, ultimately, all I care about is

 3  are you correct on this being twice what he would have earned

 4  from this scheme.  That's a very significant factor to me, or

 5  at least it seems to me it should be a very significant factor.

 6  And, ultimately, you don't have to stipulate.  You need to let

 7  Ms. Holly know what facts you do stipulate to and be prepared

 8  to present evidence if there are facts for which there is no

 9  agreements.  Ms. Holly, let me see you up here at the bench.

10          (Bench conference as follows:)

11          THE COURT:  Just let Ms. Holly know what facts

12  everyone agrees to and what facts may be disputed in the case.

13  She's going to do a supplemental memo that will go to everybody

14  reflecting those matters, and then I will take a look at it and

15  let you know what I think is significant to me in terms of

16  fashioning a sentence, and then you can decide what you may or

17  may not want to present evidence on at the sentencing hearing.

18          I don't mean to drag this out for an unusual period

19  of time or belabor this, but the presentence report is all I've

20  got to use to try to fashion a sentence, and I -- while I rely

21  on -- all the attorneys in this case, frankly, come in with

22  wonderful reputations, and I rely on them 100 percent.  But

23  when it gets to the point where what I'm hearing is different

24  from what I'm seeing in the presentence report or is not the

25  same level of seriousness as appears from the presentence

report, it puts me in a very awkward position in terms of trying to fashion a sentences that is both fair to the United States and fair to Mr. Porter.  So we'll see where we get.

Six weeks from today will be -- eight weeks will be September 5 -- September 5, 2013, at 9:30.

MR. FREEDMAN:  Your Honor, one issue I may have with that.  I know I'm starting a trial in Catawba County August 26 that could go into the second week.  I wanted to make the Court aware of that now.

THE COURT:  Tell you what, how about August 22?  I don't want to shorten it up too much.

MR. WYATT:  I believe I can fly solo here, Your Honor.

THE COURT:  All right.  I'm going to leave it September 5, 2013.  I want to get the report and take a look at it, so I may have to bump it off anyway, depending on what my time allows.  But I'm not going to just -- I don't like to leave a hearing without a date because they can fall through the cracks.  So for right now, I'm just going to set it for September 5, 2013, at 9:30 a.m., here in Greensboro, but I will notify the parties if that needs to change as a result of whatever it is that I find.  I would like to give you at least two to three weeks to get your witnesses together if there are disputed facts that need to be resolved.

All right.  If there's nothing further, we'll stand

1    in recess until tomorrow morning at 9:30.

2            (At 4:40 p.m., proceedings concluded.)

3                    * * * * *

4                C E R T I F I C A T E

5        I certify that the foregoing is a correct transcript
         from the proceedings in the above-entitled matter.

6

7                        _____

8    Date: 05/27/2014    Joseph B. Armstrong, RMR, FCRR
                         United States Court Reporter
9                        324 W. Market Street
                         Greensboro, NC  27401
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                US v. Porter - Sentence, Vol 1 - July 11, 2013