1          IN THE UNITED STATES DISTRICT COURT

2            MIDDLE DISTRICT OF NORTH CAROLINA

3   UNITED STATES OF AMERICA,        )
                                     ) Case No.1:13CR47-1
4       vs.                          )
                                     ) Greensboro, North Carolina
5   STANLEY SCOTT PORTER,            )
                                     ) September 18, 2013
6       Defendant.                   )
    _____) 9:26 a.m.

7

8            TRANSCRIPT OF SENTENCE - VOLUME 2
         BEFORE THE HONORABLE WILLIAM S. OSTEEN, JR.
9               UNITED STATES DISTRICT JUDGE

10  APPEARANCES:

11  For the Government:  FRANK JOSEPH CHUT, AUSA
                        Office of the U.S. Attorney
12                      101 S. Edgeworth Street, 4th Floor
                        Greensboro, North Carolina 27401
13

14  For the Defendant:  DAVID B. FREEDMAN, Esq.
                        Crumpler Freedman Parker & Witt
15                      301 N. Main Street, Suite 1100
                        Winston-Salem, North Carolina 27101
16
                        JAMES F. WYATT , III
17                      Wyatt & Blake, LLP
                        435 E. Morehead St.
18                      Charlotte, NC 28202-2609

19                      ROBERT A. BLAKE , JR.
                        Wyatt & Blake, LLP
20                      435 E. Morehead St.
                        Charlotte, NC 28202-2609

21

22  Court Reporter:     Joseph B. Armstrong, RMR, FCRR
                        324 W. Market, Room 101
23                      Greensboro, NC  27401

24          Proceedings reported by stenotype reporter.
         Transcript produced by Computer-Aided Transcription.
25

US v. Porter - Sentence, Vol 2 - September 18, 2013

<u>P R O C E E D I N G S</u>

1

2      (At 9:26 a.m., proceedings commenced.)

3      (Defendant present.)

4      MR. CHUT:  Your Honor, this is United States of

5  America versus Stanley Scott Porter, 1:13CR47-1.  Mr. Porter is

6  represented by Mr. Freedman, Mr. Wyatt, and Mr. Blake, and this

7  is on for sentencing, Your Honor.

8      THE COURT:  All right.  Mr. Freedman, are all of you

9  ready to proceed?

10      MR. FREEDMAN:  We are, Your Honor.

11      THE COURT:  Hold on one second.  All right.  So since

12  the last hearing, the presentence report has been revised based

13  upon what I understand to be the agreement of the parties as

14  well as perhaps some preliminary rulings.  Paragraph 8 has been

15  modified to reflect what the parties submit was the fraudulent

16  activity.  The four-level adjustment was removed.  That's

17  paragraph 17 of the PSR.  And the advisory guideline has

18  been -- or not the -- yeah, well, the advisory guideline -- the

19  total offense level has been amended to reflect those

20  modifications.

21      At this point in time, are there any -- are there any

22  objections to the presentence report?

23      MR. FREEDMAN:  No, Your Honor.

24      THE COURT:  Mr. Chut, any objections from the

25  Government?

1          MR. CHUT:  No, Your Honor.  Thank you, Your Honor.

2          THE COURT:  I have also been provided from probation

3    the charts.  It looked like they were prepared by Dan Guerrini

4    showing -- they're entitled Schedule of Forfeitable Proceeds

5    from Winterscapes for 2008 and 2009.  It looks to me like that

6    reflects the proceeds of the unlawful activity.  Is that what

7    that is?

8          MR. WYATT:  Your Honor, that would reflect the gross

9    income and the net profit from the business, and then

10   Mr. Guerrini applied to the net profit of the business a

11   25 percent reduction based upon the portion of the business

12   that was unrelated to the conduct that's before the Court.

13         THE COURT:  To come up with the $300,000 number?

14         MR. WYATT:  Yes, Your Honor.

15         THE COURT:  So the $300,000 forfeited does not

16   reflect some multiple of the -- essentially, the net profits

17   from this, it reflects the net profits, is that correct?

18         MR. WYATT:  Well, your Honor, if you look at the tax

19   accounting records of this business, they show a net profit for

20   those two years combined of $150,000, upon which Mr. Porter

21   paid taxes.  In Mr. Guerrini's analysis, credit was not given

22   for certain intercompany transfers such as credit for housing

23   provided as well as intercompany administrative services.

24   Those services were credited -- or expensed off to this company

25   based on fair market value in accordance with relevant

accounting rules.

So from Mr. Guerrini's analysis, you take the gross income of the business minus 25 percent credit, and we looked at it from the point of view of it was $150,000 profit, according to the books and records of the company, and that would have been doubled in terms of the forfeiture.

THE COURT: All right. Mr. Chut, let me ask you with the removal of the four levels from the guideline calculation, we're still proceeding under the 2S1.1 calculation. 2S1.1(a)(1), which is where the calculation is derived, says:

> The offense level for the underlying
> offense...if the defendant committed the underlying
> offense (or would be accountable for the underlying
> offense under (a)(1)(A) or 1B1.3) and the offense
> level for that offense can be determined; or 8 plus
> the offense level from the table in 2B1.1
> corresponding to the value of the laundered funds
> otherwise.

Does the Government have any idea what the value of the laundered funds was in this case?

MR. CHUT: Your Honor, if I can, the laundered funds would have been the $14,000 that's mentioned in the actual account.

THE COURT: That's the only laundering transaction in this case?

1        MR. CHUT:  Your Honor, that was alleged by the

2   Government, yes, Your Honor.

3        THE COURT:  What does "that was alleged by the

4   Government" mean?

5        MR. CHUT:  That he -- the $14,000, Your Honor, the

6   check that paid for was the laundered funds, is the laundering

7   offense, Your Honor.  There's no other evidence of laundering

8   of funds.

9        THE COURT:  Other than the 14,000?

10        MR. CHUT:  Yes, Your Honor.

11        THE COURT:  750,000 plus dollars is fraudulently

12   obtained through this process and 400,000 in net profits, and

13   the only laundered funds in the case is one $14,000 check?

14        MR. CHUT:  Your Honor, that is what the Government

15   charged, Your Honor, and that is what the evidence presented

16   today is, Your Honor.  There was other proceeds, Your Honor,

17   from the offense.

18        THE COURT:  Did the Government look for other

19   transactions?

20        MR. CHUT:  Your Honor, one moment.

21        THE COURT:  I think the answer to the question is

22   there's -- at this point in time, the Government has not

23   considered, nor would it be able to present any evidence, that

24   in light of the reduction to an offense level of 20 is there

25   any other guideline that should apply in this case.  Does that

1  fairly state it?

2          MR. CHUT:  That is fair to say, Your Honor.  We are

3  very aware of the transactions.  Most of the transactions move

4  money back and forth from one account to another.

5          THE COURT:  How many transactions with the fraudulent

6  funds in excess of $10,000 were made in this case?

7          MR. CHUT:  Your Honor, I can consult with the agent,

8  or I can call Mr. Guerrini, either way, Your Honor.

9          THE COURT:  Does the Government have any idea?  I

10  mean, what you just said was there's one transaction that the

11  evidence shows, the 14,000 alleged in the Bill of Information.

12  Is that it or not?

13          MR. CHUT:  Your Honor, in terms of the money moving,

14  there's more transactions.  In terms of a laundering offense

15  associated with that petition for 250 workers, that's the

16  laundering offense.  Now, there are -- Mr. Guerrini can testify

17  about the movement of the money back and forth, but the way the

18  case was charged, that's the laundering offense that's linked

19  to that particular --

20          THE COURT:  Does the Government have evidence of

21  other laundering or not?

22          MR. CHUT:  Your Honor, one second.

23          THE COURT:  I'm not going to waste any more time on

24  this, but with the revision of the guideline -- and, again,

25  it's not my job to prosecute a case of this type.  But here the

flow of information has been very limited in terms of what the
probation office as well as the Court can look at, and it can't
be a one-sided calculation in terms of the sentencing in order
for both sides to be effectively represented.

I, frankly, have a very difficult time looking at
these expenses and various other things and believing that
there is only one check with these fraudulently obtained funds
in the amount of $10,000, even taking into consideration the
merger issues that can arise from money laundering offenses.
It's very difficult for me to believe that with these amounts
of money that this is the only one.

However, it appears to me that at least at this point
in time in terms of the evidence presented to the Court as well
as what the parties are prepared to present, that's the extent
of the money laundering that is before the Court for
sentencing, and there's a very different case for sentencing
presented by a case in which there's one $14,000 transaction,
which is minimal in terms of money laundering or structuring or
whatever you want to call it transactions as charged in this
case, and one in which illegal proceeds are moved around from
one corporation to another, perhaps some in furtherance of the
underlying illegal activity and some separate and apart from
the illegal activity. But there's not much question looking at
these schedules that have been presented by Mr. Guerrini, and
it seems everybody agrees at least in terms of this calculation

of net proceeds, that we had 705,000 plus 756,000, a million --

1 1/2 million dollars plus that was derived from the labor and

some net amount once the expenses are taken out of $431,000.

In any event, we'll proceed with what's before the

Court today, but I -- certainly in terms of a money laundering

transaction, one $10,000 transaction is very different from

multiples, but I'll find, based upon what's presented by the

parties, that the guidelines are now properly calculated in

this case.

I will ask, Mr. Chut, does the Government have any

objection to the alternate calculations?

MR. CHUT:  The alternate calculations in the amended

PSR?  No, Your Honor, we do not.

THE COURT:  All right.  In that case, I will adopt

the presentence report as amended as reflected in the amended

PSR dated September 11, 2013.  Neither offense of conviction

carries a mandatory minimum sentence.  The resulting advisory

guideline calculation is as follows:

A total offense level of 18.

A criminal history category of I.

A guideline imprisonment range of 27 to 33 months.

A period of supervised release of one to three years

as to each count.

A fine range of 6,000 to $60,000.

And a special assessment of $100 as to each count is

1 mandatory.

2          The Government has also filed a motion in this case

3 which the Court will grant reflecting the defendant's

4 substantial assistance.

5          All right.  Mr. Freedman, you've filed a very

6 voluminous sentencing pleading with a number of letters and

7 various other matters set forth addressing the 3553(a) factors.

8 I've reviewed that.  Will there be any additional evidence?

9          MR. FREEDMAN:  No, Your Honor.  I would like to be

10 heard -- no additional evidence.  I would just like to be heard

11 shortly on the substantial assistance he's provided, and

12 Mr. Wyatt would like to address or summarize the issues for the

13 3553(a) factors.

14          THE COURT:  I'll be happy to hear from you.  Let me

15 see Probation up here before you get started.

16          (Bench conference with Probation.)

17          THE COURT:  Mr. Chut, will there be any additional

18 evidence on behalf of the Government?

19          MR. CHUT:  No, Your Honor.  Thank you, Your Honor.

20          THE COURT:  Then I will hear from the parties at this

21 time as to what constitutes a sentence that is sufficient but

22 not greater than necessary taking into consideration the

23 advisory guideline calculation, the factors set forth under

24 18 USC Section 3553, the Government's motion requesting

25 departure, and any other relevant matters.  Mr. Freedman I'll

hear from you.

        MR. FREEDMAN:  Thank you, Your Honor.  In light of
the fact this is an ongoing investigation, I don't intend to go
into the substance of what Mr. Porter has to say.  I would
prefer to go just sort of -- Mr. Porter, when he first met with
Mr. Wyatt and myself, was very forthright, very honest about
what had occurred, provided extensive documentation to us
throughout the entire process; and not only has he provided
extensive documentation to us to support everything he had to
say, he has provided it to the Government as well.  Often
between the debriefings we had with the Government, he would go
back to find emails or other letters or internal documents or
his finances to supplement to the Government to make him a
better and better witness.

        As the Court is aware, we pled pursuant to an
Information.  We did not require an indictment in this case
because discussions started prior to the charge itself, and the
cooperation started prior to the charge itself.  The first
debriefing actually occurred a week after he entered a plea
before Your Honor where we met for approximately four hours
with agents from Department of State, Department of Labor, the
IRS, US Attorney's Office.  There was actually -- we met at one
point with US Attorneys from both the Middle District and the
Western District of Virginia because apparently a lot of this
behavior -- there are a number of employers who have engaged in

1   this behavior which is why it's caught the attention of all

2   these various agencies.

3        He's been able to not only inform the Government in

4   terms of what his own activity was, but sort of how these

5   things work and other companies that may be involved and

6   different agencies he's used along the way.  This is sort of --

7   I won't speak for the Government, but I believe, at least in

8   this district, this is sort of the first prosecution of its

9   kind, and I think Mr. Porter has been helpful not just in terms

10  of substance, but in terms of procedure and structure to sort

11  of educating them -- the agents.

12       We had a further debriefing the next month when he

13  met again extensively for another two, three hours.  He has

14  testified twice before the grand jury, once prior to when we

15  had court scheduled for his initial sentencing, his first

16  testimony before the grand jury was June 25, and then he

17  testified after the case was continued again on July 30 and has

18  been ready, willing, and able to -- he was -- he's going to

19  intend to continue to cooperate, and his testimony is pretty

20  much committed at this point; and if and when the Government

21  goes forward with other actions, he's going to follow through.

22       Our concern -- and we are very appreciative of the

23  Government's 20 percent recommendation that -- we're very

24  appreciative of that, and we know that he will cooperate in the

25  future.  Our concern is based upon his guidelines and where he

1  may end up at the end of the day before Your Honor.  I don't --

2  the indictments have come down from the Government --

3         THE COURT:  Just to put it completely frankly, if I

4  imposed an active sentence of a year, and then 15 months from

5  now he completed his cooperation and was entitled to a

6  50 percent reduction, he wouldn't get the full benefit of that

7  reduction.

8         MR. FREEDMAN:  That's correct.

9         THE COURT:  I understand exactly what the issue is,

10  and, quite candidly, at this point there is a lot of

11  cooperation.  It's a complex -- that he's provided.  It's a

12  complex case, and so there is an issue here in terms of

13  structuring how all this final sentencing unfolds to -- I don't

14  want to be unfair to Mr. Porter.

15         On the other hand, I balance against that,

16  Mr. Freedman, and perhaps this is more appropriately directed

17  to Mr. Wyatt, but in a case of this type -- I guess the parties

18  can sense some of my frustration.  In a case of this type,

19  you -- Mr. Porter has entered into a very -- what I would

20  consider to be a very favorable plea agreement with the United

21  States.  In other words, there's -- I don't know what was being

22  investigated, but his counsel, at a minimum, have done a

23  tremendous job because had the Government chosen to prosecute

24  something like a mail fraud or some other offense that resulted

25  in Mr. Porter's guideline calculation being based upon total

fraud or actual loss or those types of calculations, his guideline range would be significantly higher than it is at this point in time.

So that's not to say under those circumstances then we might have been looking at weeks or months of trial and various other things, and I understand the opposite side -- the other side of that equation certainly. But, ultimately, it looks to me like in addition to the motion that the Government's filed, I think there's at least some room to suggest that Mr. Porter's plea agreement reflects some favorable treatment. I'm not saying it should count for everything certainly, but at least to a certain degree some favorable treatment that probably absent his willingness to cooperate may or may not have unfolded. So it's a complicated matter, I think.

MR. FREEDMAN: And I don't disagree with Your Honor. Of course, every time there's negotiations prior to the Government having to go through all the extent of indicting -- not just in Mr. Porter's case, but in any case that comes before Your Honor, a court, a federal court, there's sort of always a certain trade-off because, again, it doesn't put the Government through that task, and Mr. Porter has come in and freely admitted; and essentially, Your Honor, we appreciate working with the Government, but we feel the plea that Mr. Porter entered into accurately reflects what his conduct

was.  Essentially, his conduct was, as we stated last time, he
engaged in this activity to try and get around the cap.  And,
you know, if he had entered that -- or whoever entered
information on the applications had entered it properly and had
stated the true reasons for them coming in, you know, we
wouldn't be here.

          So I do agree with Your Honor, and the Government has
been very good to work with.  I would just state to the Court
what the Court's talking about could come in consideration
under any information case versus an indictment case, and
Mr. Porter has been quite forthright and very cooperative.  And
the reason I would sort of categorize his corporations a bit
more extensive than -- this isn't a typical case where -- well,
not -- where the Government comes in where they've been
prosecuting similar cases in the past and sort of have their
mechanism in place and know what they're doing.  I would
contend, at least, Mr. Porter's gone beyond that, sort of taken
an area where they're venturing into new ground, and Mr. Porter
has been of assistance not just substantive but also helping to
direct them.

          But, yes, I believe the Court understands --

          THE COURT:  I think that's a fair assessment.

          MR. FREEDMAN:  Yeah, and I do agree the Court
understands the issues obviously, and Mr. Wyatt will go into it
a little more extensively.  But Mr. Porter, other than this, he

1 has worked hard his whole life. He's never been in any sort of
2 trouble.

3 THE COURT: That's the really unusual thing, and
4 there's a component of a sentencing yesterday as well, but
5 Mr. Porter is 62 years old, criminal history category of I, an
6 accountant, by all accounts within the community and otherwise
7 a law-abiding, upstanding citizen. Then you look at this, and
8 you go -- I understand your point, but Mr. Porter -- about some
9 of the false information, but, on the other hand, Mr. Porter's
10 responsible for a tremendous amount of false information, and
11 not just little stuff, but lying to the Federal Government on a
12 number of applications and using that -- the proceeds of that
13 ultimately to his benefit, to some degree; and trying to figure
14 out why something like that happens and, more importantly, how
15 that factors into the 3553(a) factors is tricky. I make no
16 secret of it. Sixty-two and a criminal history category of I
17 is very different from a 17-year-old and a criminal history
18 category of I or a 23-year-old and a II.

19 So there's got to be some credit given for a long
20 time of law-abiding conduct. But, on the other hand, it wasn't
21 a simple little took-some-money-out-of-the-cash-drawer offense.

22 MR. FREEDMAN: No question. I didn't mean to
23 minimize the conduct, Your Honor. In fact, we have a number of
24 federal agents here, and this is a very serious offense, and
25 Mr. Porter has accepted responsibility for what he's done.

He's been before the grand jury twice.  The Government has put

him before the grand jury twice.  I believe -- and, again, not

speaking on behalf of the Government -- I believe the

Government believes him to be a valuable and honest witness to

be putting him out there for that.  So we didn't mean to

minimize the behavior.  But he's 62 and is now a convicted

felon.  You know, and I'll let Mr. Wyatt address that a little

more, but those are the things obviously the Court has to

balance.

        You know, regardless of what the Court does today,

he'll be a convicted felon.  He'll have a -- he paid a

$300,000, you know, fine the day of -- he entered the plea.

Not, fine.  Forfeiture.  Excuse me.  The fine is yet to be

determined by the Court.  He has opened his books.  He's been

an open book to the Government throughout this process, which I

believe is more consistent with who Mr. Porter has been

throughout his whole life in terms of, you know, coming back

home to help with his father's business and always being very

devoted to his family and raising his children now.  I believe

that paints a better picture of who Mr. Porter was rather than

his period back in 2008 and 2009 when he engaged in conduct

that has brought him before the Court.

        THE COURT:  All right.  Thank you, sir.  I'll hear

from Mr. Wyatt on the collection of 3553(a) factors as well as

any other matter you wish to address.

1          MR. WYATT:  Thank you, Your Honor.  I would like to

2    address three specific 3553 factors, Your Honor:  (a), of

3    course, the nature of the offense and the history of

4    Mr. Porter; (b), the seriousness of this offense, the need for

5    deterrence, the need to protect the public; and then, (f), the

6    issue of avoiding unwarranted sentencing disparities.  The

7    other factors are, quite frankly, evident from the presentence

8    report or from this Court's experience.

9          With regard to Mr. Porter and his background, as the

10   Court has noted, he's 62 years old, and he has an unblemished

11   record prior to the conduct that is the subject of this Bill of

12   Information.  In addition to that, he has shown extraordinary

13   devotion in three particular areas.  One is to his parents; a

14   second is to his sons; and a third is to his community.  He

15   has, in a very literal sense, answered the call in connection

16   with his parents, his sons, and his community.  Specific

17   examples, Your Honor, include the following.

18         With regard to his father, his father was operating

19   Highland Fraser Firs, a Christmas tree company, in the early

20   '90s.  Mr. Porter was living in Dallas, was an executive there,

21   was having his first child.  His father had a heart attack.  He

22   had troubles with a business partner in his business who had

23   embezzled a significant amount of money.  The business was in a

24   state of disarray, and his father and his father's partner

25   asked Mr. Porter to come in to clean up the situation and

1 essentially move his family to Boone to do that.

2           Mr. Porter did that.  Mr. Porter has a brother, but

3 his brother was also in a larger city pursuing a profession;

4 and he not only was able to straighten out the situation, the

5 complicated mess with the banks, the embezzlement of the

6 partner, moving a partner out, getting the business righted

7 again, but he was able also to double the sales of the business

8 over a 10-year period from 1990 to 2001.  He essentially took

9 over the operation of the business.

10           I think what is indicative of his character is that

11 during that time, no job was too large or too small for him.

12 He drove a truck.  He planted trees.  He cut down trees.  He

13 worked with the people during the busy season of the two months

14 of November and December as well as all other times during the

15 year.

16           If you look at the letters, and I know the Court has,

17 that have been submitted on Mr. Porter's behalf, he's always

18 been a very hard worker where no job was too big or too small

19 for him from the time he worked in a lumber yard when he was in

20 high school through this period of time through his other

21 businesses and now with his campground business.

22           So he righted that -- the company.  He was able to

23 sell it for his family in 2001.  He remained as a CEO of that

24 company for several years after that.  His father lived for

25 another 10 years.  He primarily took care of his father in his

old age and then took care of his father's estate. So he's
shown extraordinary devotion to his family.

In addition to that, he has two sons, Your Honor.
His older son is independent, but his younger son, Michael, is
16. He's a junior in high school. As the Court knows from the
papers, Mr. Porter and his wife separated when Michael was 7,
and they've each had custody of him for alternating weeks since
that time. Michael is very close to his father. He provides
his financial support, his emotional support, his instruction
in life.

I think two sentences from Michael's letters that are
instructive are first he says Mr. Porter is everything he
expects a father to be; and, secondly, that Mr. Porter makes
sure that he does what he's supposed to do. He's not the most
popular parent because he's the easiest parent. He's the most
popular parent because he instructs him in life and talks to
him and has him do the things he does, and that, of course,
again is in great contrast to this offense which is again
inconsistent with Mr. Porter's 62 years of life.

And going to the final issue of community service, it
started when he was in college when he started a group called
The Merc, which was a mercantile exchange. When he was in
college, he and his friend didn't have a lot of money, and
groceries cost a lot, so they began buying vegetables in gross
quantities, dividing them up, and then selling them to people.

US v. Porter - Sentence, Vol 2 - September 18, 2013

1  People then became members of this cooperative by either

2  donating two hours of work a month or paying $5 a month, and it

3  enabled not only students but professors to get foods in a

4  cost-efficient basis and started one of the initial sort of

5  health food stores at the University of Kansas where he was.

6  That institution has actually grown over the years and now has

7  over $500,000 in sales.  It still exists and has over 600

8  cooperative members.

9           In addition to that, when he was working in the

10 Christmas tree business, he became a member of the North

11 Carolina Christmas Tree Association for a period of five years,

12 was a member of the board of that organization, was a

13 legislative cochair of that organization, donated a lot of time

14 working with researchers at NC State and other institutions in

15 terms of the Christmas tree industry from pesticide issues to

16 growing issues to legislative issues.  He testified before

17 Congress.  He actually was involved in the case of the

18 *Department of Labor versus the North Carolina Growers*

19 *Association* in 1994 which was cited in this Court's *Solis*

20 opinion where there was an issue about H-2A workers being

21 treated as agricultural workers for one purpose and as

22 nonagricultural under the labor laws for another purpose which

23 required the payment of overtime, and that issue was litigated.

24           You know, in addition to all of those activities, his

25 cooperation has obviously been extremely extensive in this

case, detailed, and very helpful.

With regard to the 3553(b) factor, the seriousness of the offense, the need for deterrence, and the other factors subsumed in that, obviously this offense is a very serious offense. Any felony is a very serious offense, and it has already had very serious consequences for Mr. Porter. He lost all of the businesses, not just Winterscapes, but Carefree Best in Landscape since this conduct occurred. He is now branded as a felon, which for a small businessman is very significant. When he goes to get loans, when he goes to start up a new business if he tries to do that, having a felony on his record is going to inhibit his ability to conduct his business. He has paid a $300,000 forfeiture.

And I know it may sound insignificant but Mr. Porter grew up bird hunting with his dad and with his sons. He will never be able to do that again. Not to say that is a huge consideration, but it is a significant impact of a felony offense.

With regard to deterrence in this case, all of those consequences to Mr. Porter certainly are a deterrent in terms of the need for external deterrence of other individuals who may be in a similar situation. As far as individual deterrence as to Mr. Porter, I think this Court will recognize that there is no need for that. He's cooperated fully, fully accepted responsibility for this offense, never been involved in any

improper conduct in his life prior to essentially setting up

Winterscapes and operating it in a way so that it could be used

to get around the cap, which can have a very disruptive force

on these kind of businesses.

There's obviously no need to protect the public from

Mr. Porter.  There's no need for any educational, vocational,

or other --

THE COURT:  Let me ask a question, because on the

personal side with respect to what you've described as to

Mr. Porter, there is no question what he's done in terms of

family, friends, and community in many, many respects.  But as

far as the business side and no need to deter and criminal

history category of I, one of the things -- and I'm not saying

whether this will or won't affect me, but in light of your

argument I would like to hear your position on it -- is that

when you do something as extensive as this, it's -- well, let's

go to drug cases.  It's very difficult sometimes to believe

individuals actually got caught the first time they engaged in

a drug transaction.

So often when a case is being prosecuted, an

individual stands up and says, you know, I've never done this

before, and the 5 kilos in the back of the car were just

something somebody asked me to do.  That's sometimes received

skeptically, because current events cast a light sometimes on

past events.  Now, I know that Mr. Porter is a criminal history

category of I.  He's been a successful businessman with a
number of different businesses.  Fabulous turn around of his
father's Christmas tree business when it was struggling.

But when something like this comes to light, it can
cast a shadow backwards on what may or may not have been going
on.  Now, not enough of a shadow to look back and say I will
throw out all the good things that he has done in these
businesses, but enough of a shadow to say it's hard for me to
give him significant credit in terms of what he's done in the
past because I am uncertain as to how he may have accomplished
that in the past in terms of the business that he did.

What's your response to that if I say that's my
position on -- in terms of his growth and success in the
businesses he's had previously?

MR. WYATT:  Your Honor, I believe we can address that
speculation or that concern of the Court directly.  First of
all, the year prior to Winterscapes, Mr. Porter had
difficulties with the cap.  He did not resort to the tactics
that occurred with Winterscapes.  He had to scramble in order
to find other American workers, to find workers from different
locations in the country, to find any other workers that he
could get to meet his clients' needs.

The Government when we met with them had been
investigating this case for at least a year, maybe two years.
They have investigated every aspect of all of his businesses.

There is no basis for any criminal charge based on conduct that

occurred prior to Winterscapes.  But what occurred prior to

Winterscapes was a tremendous disruption of the business by

factors that were totally out of his control; for example, the

fact that the cap hit, and no workers could be brought in.

And so what happened in this case, Your Honor, was

that Winterscapes was formulated with the idea initially of

being able to address that issue.  It was formed, and what

occurred is the initial 50 workers who came into Winterscapes

came in legally.  They were either American workers, they were

workers who were rolled over already here legally, or they were

workers who crossed legally.

What happened then is that the cap hit again in

January of 2009, and instead of workers -- and that affected

not Winterscapes necessarily, but the other three landscaping

businesses he had because their approvals had been to bring

workers in on April 1, not on February 1.  The initial

petitions for those businesses had requested an approval for

February 1, but the Department of Labor, when they approved

them, approved it for April 1 which caused another huge

problem.

THE COURT:  All right.  Let me stop you --

MR. WYATT:  So what happened was workers went

directly there.

THE COURT:  I've heard the reference to the cap

US v. Porter - Sentence, Vol 2 - September 18, 2013

hitting several times.  Now, as a matter of logic -- I'm not a businessman.  But when the cap hits, and you can't get any more foreign workers in at that rate, then the response to that, it seems to me, is you've got to find American workers if you can, and to do that you've got to raise what you pay those American workers for the work that they're going to do, and in turn, assuming normal business practices, you have to raise the rates that are charged to the people you're providing the service to. That's kind of a normal market response.

So I understand the difficulties of raising rates to customers.  Customers don't automatically say, okay, fine, I'll pay you $100 more this week for the same service that I was getting last week.  But on the other hand, isn't that what's supposed to happen when the cap hits?

MR. WYATT:  Well, when the cap hits, you have to do things to provide workers to your businesses, or they're not going to hire you again the next year.  Prior to Winterscapes, that's what Mr. Porter did.  He went out and tried to find every worker he could find.

Now, in 2008, 2009, not only the ski resorts, but the other landscape businesses, were already under contract, and you had the shortage of workers.  Admittedly, Mr. Porter did the wrong thing.  He had workers who crossed under Winterscapes visas; and instead of going there and working for a couple weeks or a month and then moving to the coast, which would have

been proper, they went straight to the coast.  You know, one of

the business considerations there was you had the ski resorts.

They had their employees working.  They had been working there

for several months.  And all of a sudden, as -- Mr. Porter

would come in and say, well, we're moving all those people out

of there, we're bringing 50 new people in right in the middle

of the ski season.  They didn't want to do that.  They should

have done that.  There's no question that Mr. Porter and his

company clearly violated the law.

        But to address this Court's concern, you know, that's

what occurred that year in Winterscapes, but that is not

indicative of what happened for the period of time from

literally 2000 until that date in terms of the operation of the

business.

        THE COURT:  At least with respect to the H-2A, H-2B

program, unless you're telling me that he's been audited or

investigated in every capacity possible during that period of

time.

        MR. WYATT:  I'm not aware of audits or investigations

during that time, but, you know, he had to file tax returns.

He had to prepare everything.  He had employees who prepared

all of the accounting records for the businesses.  Quite

frankly, Your Honor, we are here before this Court because of

the effect the cap had on the business and the wrong response

to that in connection with Winterscapes.  That is why we're

here before the Court.  Mr. Porter accepts complete
responsibility for that conduct and has shown not only an
acceptance of responsibility, but a willingness to help the
Government in any way possible in terms of the situation.  And
that is the sum and substance of his conduct, and we --

THE COURT:  If I say you're here because Mr. Porter
lied to the United States, do you agree with that, or is that
part of what you're saying?

MR. WYATT:  Yes, Your Honor.  On the applications
where there was a statement of need, that information was
false, and that is why we're here, and Mr. Porter has fully
accepted responsibility for that.

THE COURT:  Okay.

MR. WYATT:  There's no question there were
intentional violations of the law in connection with either the
Form 750, 9141, or 9142 that were submitted to the Government
in connection with the Winterscapes workers.

And, you know, again, that is the sum and substance
of why we're here.  You know, we met with the Government during
their investigation.  They had investigated this case
thoroughly.  We had several meetings going over all of
Mr. Porter's conduct, and one of the reasons this case was able
to be resolved by a Bill of Information is because we all
agreed on what the illegal conduct was, and it was centered and
limited to this situation, Your Honor.

```
 1          THE COURT:  I think we were talking about the
 2   seriousness of the offense and the general and specific
 3   deterrent and that kind of thing.  Mr. Wyatt, I will say that
 4   Mr. Porter committed the -- in relation to the cap issue that
 5   you argue in terms of national interest, there were two things
 6   of significance during that '08/'09.  One of them was a
 7   substantial unemployment rate which may be, as I've suggested,
 8   related to some of the damage that -- he's not responsible for
 9   the national unemployment rate, I understand that, but there
10   were consequences to his choice of action during that time.
11          On the other hand, these offenses were committed at a
12   time when change in immigration policy was at the forefront.
13   I'm not sure the guidelines have necessarily been adjusted to
14   reflect a changing policy toward immigration or at least an
15   interest in changing policy toward immigration.  How do you
16   evaluate the seriousness of the offense once you get past the
17   simple false statement component of the offense?  For example,
18   arguably, there may be a difference between making a false
19   statement to permit a terrorist to enter the country and commit
20   an illegal act and a difference between a false statement made
21   in an effort to allow some individuals to come into the United
22   States and work in a different place from where they're
23   otherwise assigned to work.  What's your reaction to that in
24   terms of the seriousness of the offense under 3553(a)?
25          MR. WYATT:  Your Honor, every worker who was
```

identified in the Winterscapes petitions and the I-129 petition
was identified accurately. It was a real person. It was a
real worker. They had to present their paperwork at the
border. They had to be screened and certified by the consulate
at the border. So there is not an issue in this case of
conduct which would allow seepage of unwanted individuals into
this country at the border or those type of immigration
concerns that are obviously very legitimate concerns for our
country in terms of terrorism, in terms of people infiltrating
the borders.

THE COURT: And I didn't mean to suggest that was
something that could happen. But in assessing the seriousness
of the offense, I know there are adjustments for terrorism, but
occasionally I'll look at, for example, a 922(g) offense and
say, well, you took the gun to the pawnshop and pawned it, and
so that falls to the less serious end as opposed to the
individual who's got seven prior bank robberies, and you know
good and well he's headed to do his 8th bank robbery with the
gun, but they stopped him in the car with the gun, so that
seriousness of the offense can vary significantly. How do you
assess that in Mr. Porter's case?

MR. WYATT: Your Honor, Mr. Porter is responsible
essentially for three actions, I believe, that constitutes his
criminal conduct. One is essentially the statement of need
that was presented in the first application; second is the

statement of need that was presented with regard to the second application; and the third is after the first application was improved -- approved, bringing workers in instead of them going to Winterscapes to the ski resorts directly then working at other locations, those workers going directly to the coastal location in the landscape business.

Now, the landscape companies had already filed their own petitions. Those areas had already been screened for American workers for the prevailing wage rate, so he was not bringing workers in and sending them to California. He was actually sending them to areas where he already had petitions approved, but he couldn't get his workers in because the Government said you can't bring them in February 1, you have to bring them in April 1.

And so his conduct is focused on those things, and in terms of, you know, the workers, how they were treated, you know, they were provided housing, they're provided advance to work in terms of the crossings, all of that was done within the proper procedure in terms of the Immigration Department and Labor Department, Your Honor.

THE COURT: All right.

MR. WYATT: With regard to the final factor, sentencing factor F, which is unwarranted sentencing disparities, obviously no case is ever exactly identical to another case, but there are two cases we've cited to the Court,

recent cases, involving very similar conduct -- *United States versus Brake*, which is out of the Eastern District of Missouri, and United *States versus Voisine*, which is out of the Western District of Missouri -- that involved what appears to be very similar conduct.  In those cases, the individual defendants received probationary sentences.

You know, the conduct, for example, in *United States versus Brake* was having Mr. Brake, who had a landscape company, who formed a snow removal company, and both of those companies he essentially subcontracted workers that were supposed to be working for him to another individual.  In that case, the corporation pled to a felony.  Mr. Brake pled to a misdemeanor. The conduct covered a three-year period.  Mr. Brake received a two-year probationary sentence, and there was a forfeiture of $145,000.

In the Voisine case, Your Honor, those were visa, mail, and document fraud charges, all felony charges, brought against Mr. Voisine.  He essentially was bringing in workers to Branson, Missouri, which is an amusement park area in Missouri. Instead of having those workers come work in Branson, he had them go work in Myrtle Beach.  In that case, Your Honor, the conduct involved over 100 workers.  There was a million dollars worth of revenue involved.  There was a 5(k) motion based on cooperation, and he received a probationary sentence and $170,000 forfeiture.

1        Obviously we cite these cases to the Court simply for

2   the Court's consideration.  We recognize that no case is always

3   going to be factually identical in any respect, but we do

4   believe they're worthy of the Court's consideration under 3553

5   factors.

6        THE COURT:  Certainly in terms of criminal history,

7   they would not have a -- they couldn't have a lower criminal

8   history, and in terms of offense conduct there is -- they're

9   not squarely on all fours, but in terms of numbers and

10  underlying conduct, there is -- at least appears to be some

11  similarity with respect to some overlapping factors, I think.

12  So unlike some cases, it's a little -- those cases actually

13  appear to have some persuasive authority to me.  I'm not saying

14  that's where I end up, but there is some persuasive authority

15  to that.

16       MR. WYATT:  Yes, sir, we understand.

17       THE COURT:  Let me ask one other factual question

18  that just came to me, and I was looking at it this morning.

19  The presentence report alleges in paragraph -- let me find

20  mine.  It may have been the first PSR.  Somewhere I -- oh, here

21  it is.  In the new paragraph 8, "The investigation revealed

22  that from at least May 13, 2008, continuing up to October 14,

23  2010..."  Those spreadsheets showed for the years 2008 and

24  2009, and I think I heard you reference 2008 maybe up

25  through -- you might have referenced up through April of 2010.

1   What was going on in 2010?  I've got no financials, and I don't

2   have a lot in the way of facts.

3          MR. WYATT:  Yes, Your Honor.  First of all, the first

4   petition covered the time period of 2008/2009 because it

5   covered the period of September 1 through, I believe,

6   February 1 or March 1.  The second petition covered the time

7   period 2009/2010, which would have been that same time period

8   during those years.  The only workers that crossed or that were

9   crossed and sent to golf courses occurred under the first

10  petition, 2008 and 2009.  There were seven workers who were

11  crossing in November of 2009.  They were stopped at the

12  consulate.  They were questioned.  They were not allowed to

13  cross the boarder because the description was a janitor, and

14  they called the ski resort, and the ski resort said, well,

15  they're snowmakers.  So they were not allowed to cross.  So

16  none of the 250 workers who were identified in the second

17  petition crossed, nor was any revenue generated from any of

18  those workers.

19         THE COURT:  What happened up through -- I'm assuming

20  there would be up through October of 2010.  Are you saying --

21         MR. WYATT:  No, it would be October of '09, Your

22  Honor.

23         THE COURT:  Paragraph 8 --

24         MR. WYATT:  If they had crossed, then they would have

25  been working into 2010, Your Honor.  So I think the reference

in the PSR is to the fact that the I-129 and the 9142 form for

that 2009/10 period stated a period of time from September 1

through March of 2010 when, in fact, no workers came in under

that petition.

THE COURT:  The PSR, that paragraph 8, which I think

is the paragraph you all submitted --

MR. WYATT:  Yes, Your Honor.

THE COURT:  -- says "The investigation revealed that

from at least May 13, 2008, continuing up to October 14, 2010,

the defendant was involved in submitting petitions which

contained false statements and representations."

MR. WYATT:  Your Honor, that would be the time period

covered by that second petition, Your Honor.  There was no

third petitions submitted during 2010.

THE COURT:  So you're saying the second petition

extended all the way through October of 2014, not February

of -- excuse me --

MR. WYATT:  Well, it would have extended through

March in terms of that time period, Your Honor.

THE COURT:  Okay.  Well, what's continuing up to

October of 2010?

MR. WYATT:  I'm not aware of anything that would have

continued to then.

THE COURT:  I'll give you a second.

(Discussion between defendant and his counsel.)

US v. Porter - Sentence, Vol 2 - September 18, 2013

1    MR. WYATT:  Your Honor, it could have been that some

2 of the workers who came under the first petition through '08

3 and '09 continued to work until that period of time, which they

4 could do legally through a rollover or through a transfer.

5    THE COURT:  I mean, did they?  Do we know?  The

6 reason I'm asking is simply I've got a gap here that looks like

7 something was going on through October of 2010, but listening

8 to you, it doesn't sound like anything was happening after

9 February or so of 2010.

10    MR. WYATT:  Your Honor, the only tax returns filed

11 for Winterscapes involved the tax years '08 and '09.  If there

12 were workers who crossed on Winterscapes but then worked for

13 one of his other companies through October, their income would

14 have been reported, but under Best or Carefree or Landscape.

15 So to our knowledge, Your Honor, there is no activity other

16 than the possibility that some of those workers continued to

17 work until that date.  Like we said, the first petition covered

18 the '08 and the '09 work forces.  The second petition was for

19 '09 and '10.  Nobody crossed under the second petition, but

20 there may have been some workers that continued past that March

21 date in 2009.

22    THE COURT:  All right.

23    MR. WYATT:  In summation, Your Honor, we would ask

24 the Court to weigh what Mr. Porter has done throughout his

25 life.  He's a man who has answered the call on a number of

1    occasions.

2         In terms of his background, Your Honor, we hope that

3    he has earned the benefit of the doubt in front of the Court

4    after 62 years of the type of things that he has been doing.

5    You know, the other concern or point we would ask this Court to

6    take into consideration in this case is that Mr. Porter be able

7    to get the benefit of his cooperation given the time issues in

8    this case.  Thank you, Your Honor.

9         THE COURT:  Thank you, Mr. Wyatt.  Mr. Chut?

10        MR. CHUT:  Your Honor, I'm going to start with the

11   seriousness of the offense, I'll go to the defendant's

12   characteristics and talk about some specific sentencing

13   factors, and I'll end up touching on the sentencing disparity

14   issue.

15        The United States would ask for a sentence within the

16   guidelines recommended by the PSR.  We would certainly ask for

17   an active sentence, Your Honor, even with Mr. Porter's

18   cooperation.

19        This is a very serious case, and it's serious for

20   three reasons.  One, law shapes how business is conducted in

21   the United States.  I was disturbed in hearing Mr. Porter's

22   argument from Mr. Wyatt that I respectfully disagree with that

23   when the cap hit, he had to do these things.  All businesses --

24   this sentence needs to reflect the fact that all businesses in

25   this country are limited by law, whether it be the immigration

1  law, the tax law, wage law; and when businessmen and

2  experienced businessmen with acumen and resources choose to

3  violate the law and commit fraudulent acts, that creates a

4  playing field where a businessman like Mr. Porter who has

5  basically fraudulently represented to the United States that he

6  needs hundreds of workers in the mountains when he intends to

7  ship them someplace else gets an unfair benefit -- substantial

8  unfair benefit on the business people that stay within the law

9  and respect the law.

10  THE COURT:  Let me ask this question, and it's a

11  rhetorical question, Mr. Chut, but you've raised this business

12  ethics issue.  I would assume that you would also contend that

13  the Government has to operate within the laws that are passed

14  and the Constitution.

15  MR. CHUT:  Yes, Your Honor.

16  THE COURT:  So the Government makes a decision -- an

17  agency decision that it will not enforce certain components of

18  the immigration law.  Under certain circumstances, we're not

19  going to deport.  That's the current state of things.  What is

20  it in your mind that makes it so much worse when a business

21  person chooses to ignore the law as opposed to when the

22  Government says we're not going to enforce certain laws?

23  MR. CHUT:  Well, Your Honor, I don't necessarily

24  speak for the Immigration --

25  THE COURT:  I understand.

US v. Porter - Sentence, Vol 2 - September 18, 2013

1        MR. CHUT:  -- or the decision-making portion, Your

2  Honor, although I do understand the Court's question.

3        This is a nation of laws, and to some extent, Your

4  Honor, when the Government chooses to act a certain way, this

5  is a democracy, and the people of the United States can change

6  the Government if they so choose.  The criminal laws of the

7  United States protect us from the acts of citizens, and this is

8  not a simple matter of ignoring the law, this is a matter of

9  two years in a row, which is an important point, creating what

10 is basically a fraudulent business representing to the United

11 States as hundreds of snowmakers needed in one year and

12 hundreds of janitors in the second year.  These are active acts

13 of fraud.  The criminal law of the United States protects the

14 people from that.  The Democratic process protects the people

15 of the United States from the Government making inappropriate

16 choices, if that addresses the Court's concern.

17        THE COURT:  Well, to put it a little more

18 specifically then.  Most fraud offenses, and this offense,

19 starts you at a base offense level of six, seven, or eight and

20 then adjusts based on the conduct.  If there is flux and

21 uncertainty as to the proprietary -- to the appropriateness of

22 our immigration laws, then certainly lying to the Government

23 can't be excused, that part.  How do you rate the seriousness

24 of the offense in this case when Mr. Porter brought people into

25 work, and there's no -- apparently no other illegal activity

1    associated with this?

2         MR. CHUT:  Your Honor, I don't subscribe to the

3    concept the law is in flux.  The cap was in place as a basic

4    function of this country's lawmaking ability, and, quite

5    frankly, it's immigration law.  It's a basic function of

6    sovereignty.  I don't see how the cap was in flux.  The cap

7    protects the people of the United States that get a job in

8    their own country.  I think this is no more in flux than the

9    tax code in a particular case, Your Honor.

10         THE COURT:  I mean, the H-2A and H-2B rules changed

11   from 2008 to 2009 and then again later in '09 and again in '10.

12         MR. CHUT:  Well, the cap was -- certainly, Mr. Porter

13   knew how the cap worked as he went through an elaborate scheme

14   to avoid it.

15         Your Honor, he pled on a Bill of Information, and,

16   you know, obviously the Department of Justice makes decisions

17   based on what it thinks is the interest of the case or the

18   country.  But he had pled guilty to felony visa fraud because

19   he came up with a scheme to fraudulently represent that all

20   these workers were needed completely fraudulently, and this --

21   the Government of the United States works on people making

22   truthful statements to the Government, whether it be the

23   immigration law, whether it be the tax law, whether it be any

24   sort of thing.

25         So this conduct, I'm just -- I disagree sharply and

 1   respectfully with the defense, this is not a matter of some

 2   type of, well, the law is in flux.  He understood what the law

 3   was, and he chose -- two years in a row.  One year when it

 4   worked, he came back with more to do 250 workers knowing

 5   there's five workers.

 6           So this isn't a matter of the law being really that

 7   much in flux.  Maybe in general, Your Honor, but for the cap,

 8   Mr. Porter understood what the cap was.  He understood what a

 9   business disadvantage it was to be forced to hire Americans and

10   do whatever, and he took -- he made elaborate false statements

11   to the Government to get around that, to bring in a large

12   number of workers.

13           And one of the factors that bears on the seriousness,

14   I think, the Court should take into consideration is, yes, he

15   has a good business history and has no record.  But when this

16   worked in 2008, when the snowmakers thing worked, and he got

17   100 extra bodies, or how many ever extra bodies he got, it

18   wasn't a one-time thing.  He came back the next year and said

19   let's really ratchet it up.  I know I need five or six; let's

20   ask for 245 extra.  I think that's a factor the Court should

21   take into account.  This is a fraud that worked once, and this

22   defendant came back.

23           And none of this contradicts his helpfulness or his

24   cooperation or his acceptance of responsibility.  But the fact

25   is when he -- when this worked once, like anybody that learned

something works, he came back and wanted to do it in a bigger

way.

THE COURT: Would you ratchet it up based simply on the number of false applications as the guidelines have done more than 100, or would you ratchet it up based on the profits to Mr. Porter?

MR. CHUT: I guess what I'm addressing here, Your Honor, is sort of the intentionality of the crime. I think if we had -- if Mr. Porter had done it once in '08 and got caught and charged, that would be a different case than the level of mens rea or intentionality to come back and do it again. I think the guidelines have taken into account the number of visas, Your Honor.

I guess what I'm looking at in terms of the seriousness is almost an intentionality issue. It's not a defendant that did something bad once and thought, whew, good thing I got away with that, let's go back to normal business, or let's address it in a different way. When it worked, he came back and tried in a bigger way.

I'm not trying to suggest, Your Honor -- the guidelines take into account the amount of visas, and that's in the advisory guideline range. What I'm speaking to is in terms of the seriousness of the offense is the intentionality of the offense.

THE COURT: So your position can be summed up as

1    simply the multiplicity of the offenses.  Two years and two

2    different types of offenses suggest that any type of variance

3    understates the seriousness of the offense.  Is that where you

4    are?

5            MR. CHUT:  Outside of the variance recommended by the

6    Government, Your Honor, yes, and I don't think this is an --

7            THE COURT:  That's the departure you were talking

8    about for the Government.

9            MR. CHUT:  I don't think there should be a variance.

10   I think a guideline sentence, Your Honor, whatever level you

11   set it, is appropriate.  And I really think, Your Honor, and I

12   feel very strongly about this, that the sentence here has to

13   send a message to business people, smart business people like

14   Mr. Porter, educated people like Mr. Porter, because all those

15   characteristics cut both ways, Your Honor.  You know, it's --

16   I'm not disputing what was said about Mr. Porter.  But all

17   those same factors indicate, I guess to put it in the

18   vernacular, he should have known better.

19           THE COURT:  Would you send the message through an

20   active sentence or a fine or both?

21           MR. CHUT:  I think both, Your Honor.  I think with a

22   serious -- and none of this is, again, to disagree that he has

23   many positive factors, not to disagree he's cooperated.  But I

24   think when we allow businessmen, experienced businessmen, to

25   engage in extensive fraudulent conduct to get a business

advantage over law-abiding business people, that that sends a

message that the law doesn't matter.

THE COURT:  Would you tie the fine -- any fine to the

profits, the forfeiture -- forfeited amount, or what Mr. Porter

was making during that time?

MR. CHUT:  Your Honor, I think profits --

THE COURT:  Or his current assets.

MR. CHUT:  The profits, Your Honor, would be perhaps

a good measure.  And I've touched on the characteristic --

THE COURT:  The profits that have been disclosed

here?

MR. CHUT:  Yes, Your Honor.

Your Honor, I'll note in terms of the seriousness

also, the cap is not -- these laws -- and I do understand that

in the large scheme, there's some fluctuation.  The immigration

laws of the United States are a basic function of the

sovereignty of this country.  The cap exists to protect

American workers.

THE COURT:  And don't get me wrong, Mr. Chut.  I'm

asking questions.  I'm not suggesting what I think about the

law.  My duty is sworn to uphold them.

MR. CHUT:  Yes, Your Honor.  When Mr. Porter says

through Mr. Wyatt -- and I respectfully differ and certainly

don't mean any disrespect.  But when he says, well, the cap

causes difficulties, well, the answer is go hire Americans, not

create a false snowmaking business or a false janitor business.
Hire Americans.  The cap is not a minor thing.  It's the law of
the United States.  It goes to the basic sovereignty, and it's
in place to limit the amount of foreign workers in this
country.

Your Honor, to hit briefly the factors -- I guess
I've sort of hit on them already.  Deterrence, really more
general deterrence than specific deterrence and respect for the
law.

THE COURT:  So you agree with the defendant's
argument in terms of individual deterrence to Mr. Porter, that
factor rates pretty low.  It's more deter others similarly
situated?

MR. CHUT:  I do, Your Honor.  I think it's to deter
other business people, to send a message that -- in this
particular case, the immigration laws of the United States --
the immigration laws of the United States may change, Your
Honor, like laws often do, but they're still the law.  They're
still going to impose limits.  There's always going to be an
advantage to not having those limits.  You know, an easy
analogy would be if you didn't have to pay minimum wage, I
suspect you could have more profit.  Certainly, Your Honor, on
the tax side of the DOJ house, we've dealt with nonpayment of
payroll taxes.  There's an enormous advantage to not paying
payroll taxes if we're businessmen.  So respect for the -- in

terms of deterrence, Your Honor, I'm really talking a general

deterrence.

Let me touch briefly, Your Honor, if I could, on --

THE COURT:  Let me ask you specifically before you

turn to that to what I perceive as something of a paradox.  I

understand and agree with much of your argument here, Mr. Chut,

in terms of the seriousness of the offense, and I personally

think a lot of the seriousness is reflected not only in the

number of visas, but in terms of the profits derived from the

offense.

But the Government has chosen here to prosecute

Mr. Porter for two offenses:  The money laundering offense,

which, arguably, could be tied to some of the profits, and the

Government has not presented any evidence of anything other

than a $14,000 transaction; and in terms of Count One of the

Indictment, the guidelines don't call for any correlation

between the fraudulent conduct and the actual profits from the

offense like something that would have used 2B1.1.

So is there a little paradox in your arguments here

and what the Government has chosen to charge Mr. Porter with?

MR. CHUT:  No, Your Honor.  I'm really speaking about

an active sentence.  I think that's what sends the message more

so than the money.  The United States chose to charge this --

you know, this is, Your Honor, like any Bill of Information

case, a negotiated deal, but the United States also makes

 1  decisions based on the evidence and the law, and unlike --

 2          THE COURT:  Presumably, you determined the evidence

 3  didn't support a more serious charge?

 4          MR. CHUT:  Well, Your Honor, I think visa fraud is a

 5  serious charge, Your Honor, one.  Two --

 6          THE COURT:  Well, let's say a charge that would have

 7  tied sentencing to financial loss or the actual fraud itself?

 8  I mean, the heart of this case certainly on the one hand lies

 9  to the United States, but I hear what you're arguing in terms

10  of the measurement of his culpability not only goes to the lies

11  to the United States, but the profit that he made if I'm to tie

12  a fine to profitability.  I don't have an offense here for

13  which any evidence has been presented that would require

14  application of a guideline that uses profitability as a

15  measure.

16          MR. CHUT:  That's correct, Your Honor.  The United

17  States, based on the evidence and the issues at hand, chose

18  this particular charge, and I think it's in the interest of the

19  United States, and I think it's a serious charge, and I think

20  it reflects the conduct.  Unlike other areas of fraud that this

21  office or myself work in, some of the law about immigration

22  fraud is not perhaps as well set.  So this is, Your Honor, a

23  charge the United States chose and thinks is appropriate and

24  continues to think is appropriate, and I think it's serious.

25  And I would encourage the Court, Your Honor, to take most of my

1   argument as bearing on the active nature of the sentence.

2          THE COURT:  How do you distinguish or what would you

3   say in response to the defendant's argument that here are two

4   other prosecutions of a similar type with -- perhaps not as

5   much in terms of amounts or other things.  It seems like one of

6   the cases was maybe 141,000 in profits or proceeds, and here

7   we're talking about 300 or 400, depending on which calculation

8   you use.  But more than likely, criminal history categories of

9   I in both cases, who knows the age of the individual defendant,

10  and there in both cases we're talking probationary sentences

11  were imposed.  How do you -- if one of the factors I have to

12  consider is the need to avoid sentencing disparities, how do

13  you distinguish those cases?

14         MR. CHUT:  Well, Your Honor, I guess I have a couple

15  things to say about that.  One is a philosophical one is that

16  we have a system that goes through this complicated -- I

17  understand the need to avoid sentencing disparity.  I'm always

18  sort of at a loss what that exactly means.  We go through a

19  procedure in a case before the Court.  It's a very detailed

20  process to calculate a guideline.  Then we normally -- these

21  are snapshots of these other cases, Your Honor, and I'm always

22  concerned that a snapshot may not catch an aspect of the case

23  because it's a snapshot based on available records that the

24  Court doesn't have in this case.

25         THE COURT:  I mean, they've attached some pleadings.

US v. Porter - Sentence, Vol 2 - September 18, 2013

1    Have you looked to compare?

2            MR. CHUT:  And there's some similarity, Your Honor,

3    I'm not saying there's not.

4            THE COURT:  What's different?

5            MR. CHUT:  I think what's different, Your Honor, is

6    the ratcheting up of the conduct and the amount of visas, and

7    I'm not -- I'm not going to disagree, Your Honor, there are

8    some similarities.  They are basically cousins of this case.

9            I think, Your Honor, that in this particular

10   situation, it appears to me from those indictments that the

11   volume kind of built up in those cases as opposed to sort of

12   how serious his conduct was initially.  So I think that would

13   be my strongest argument, Your Honor, that -- to distinguish

14   this case and the state of the guidelines, Your Honor, is the

15   volume.  Then with my general caveat about those cases being

16   kind of snapshots as opposed to full information available to

17   the Court.

18           Thank you, Your Honor.

19           THE COURT:  Let me see counsel up here.

20           (Bench conference as follows:)

21           THE COURT:  I have one what I think will be a

22   relatively quick status conference, and then I have a

23   sentencing that I found the guideline range, but then when the

24   defendant allocuted, I decided that I was going to consider

25   whether to take away acceptance.  So I have two relatively

short matters that Mr. Bryant and Mr. Huggins -- is he here?
Yeah.  I'd like to get those done.  I'd like to take a few
minutes and think about this before I render a final judgment
in the matter.

So what I would like to do now is go ahead and hear
from Mr. Porter if he's got anything he'd like to say, and then
I would like to -- I'll take a break, but I probably won't come
back to this case for a little while because I'd like a little
time to get back and reflect, and I'd like to get them out of
here before I -- instead of making them wait another hour or so
on me to get them out.  Do you all have any objection to that?

MR. FREEDMAN:  I'm with you all morning after this.

THE COURT:  Yeah, the Lusk case can wait --

MR. FREEDMAN:  He's not in custody.

THE COURT:  We'll deal with that one last, but these
other two are relatively short.  Thank you for that.

(Bench conference concluded.)

THE COURT:  Mr. Porter, let me explain to you.  I am
going to take a short -- or some break before I actually impose
the sentence.  I've got two relatively short matters that I --
or what I think will be relatively short that I'd like to
address, and then I want a few minutes before I get around to
finally determining a sentence in your case.  So we'll take a
break after this to give me some time to address those matters
and take a short recess.

At this point, though, I am going to go ahead and proceed to finish the sentencing process as far as we can, and this is a point in time when I give the defendant an opportunity to speak should he choose. I will advise you before you speak that you're not required to say anything; and if you choose to remain silent, your silence will not be considered against you in any way whatsoever. But you do have the right to address the Court before any sentence is imposed; and if you wish to address the Court, then now would be the appropriate time for that. Is there anything you would like to say?

THE DEFENDANT: Well, I would like to say I take full responsibility for everything that I've done. Counsel has done a good job of describing what I did. I think both sides have agreed to what I did. I agree what I did was wrong, and I shouldn't have done it, but I did do it.

I have to tell you that the -- and say that the probation officers that I worked with, Odessa and Darrell both, have conducted themselves in an extremely professional manner, and I appreciate it. It's helpful to me and my community that they did it the way they did it. And the agents and the prosecutor have been very good with the cooperation process and working together toward an end and being interested in hearing the truth and the facts rather than just something that I would say that would make them happy. So for that I'm thankful for

1    everybody in the process.

2           THE COURT:  I appreciate what you said, and I'm glad

3    to hear that on behalf of our -- I'm not surprised, but I'm

4    glad to hear that on behalf of our probation officers.  In many

5    respects, they are the unsung heros of the system.  If I happen

6    to get a result that's fair and just in a particular case,

7    usually it's because of the work that they have done.  So thank

8    you for what you recognized by your comments, Mr. Porter.

9           THE DEFENDANT:  Thank you.

10          THE COURT:  All right.  We're going to take -- yes,

11   sir?

12          MR. CHUT:  Your Honor, may I make a brief point that

13   may affect the Court's thought?  Special Agent Thomas has

14   pointed out to me the vast majority of any possible money

15   laundering offenses, Your Honor, with this district is another

16   venue over.  They're actually in different districts.  So I

17   should have pointed that out to the Court, Your Honor.

18          THE COURT:  Yeah, there is a difference between

19   relevant conduct and venue, Mr. Chut.

20          MR. CHUT:  Yes, Your Honor.

21          THE COURT:  All right.  We'll take a 10-minute

22   recess.  When I come back, I'll leave it with -- I guess

23   Mr. Meinecke is in both cases.  I'm going to address the status

24   report in the Trexler case, and then we'll finish the Early

25   sentencing at that point, and then -- the marshals aren't here.

US v. Porter - Sentence, Vol 2 - September 18, 2013

1  I'm going to -- then I'll take a short recess and come back and
2  finish this case.  So you all be ready to address those two
3  cases next.  We'll be in recess for 10 minutes.
4          (At 10:55 a.m., break taken.)
5          (At 12:14 p.m., break concluded.)
6          THE COURT:  Let me see counsel up here at the bench.
7          (Bench conference as follows:)
8          THE COURT:  I'm going to do something a little
9  unusual.  I'm going to tell you what I'm considering doing at
10 this point, and then I'm going to give you five minutes to
11 think about it, because it is different -- a different type of
12 sentence.  I'll explain my reasoning on it later, but I think
13 it's a serious sentence, and the sentence I am about to
14 impose -- or considering imposing will be a variance.
15          But the gist of the sentence is this, that I'm going
16 to impose 24 months with three years of supervised release.
17 The 24 months is going to be served 12 months active, 12 months
18 house arrest.  As a condition of supervised release, I'm going
19 to set a reporting date out for six, eight, ten, twelve months
20 or so, and I'm going to order that he go ahead and satisfy the
21 house arrest component of the sentence starting in about a week
22 or two or however long it takes to set him up.  To the extent
23 that's a variance downward, I'll explain why I think it's
24 appropriate here.
25          I'm going to vary upward on the fine.  The fine range

is $6,000 to $60,000.  He's got assets.  I know his business is

closed, but this is a financial crime, and he derived, for

whatever reason, substantial -- what I consider to be the

actual net proceeds, but I understand that administrative

expenses have been incurred there, so I'm considering imposing

a fine of $100,000.

That gives him time to work off his substantial

assistance, and I can cut his active component down at a later

time.  I understand the Government wanting a sentence within

the guideline range, and at 24 months, arguably, that's not

within the guideline range, but I'm varying downward on one end

and going up on another end.

So talk to your -- well, I don't care whether you

talk to Mr. Porter at this point or not, but talk amongst

yourselves because it is an unusual structure of the sentence.

I think it can be done.  I know I --

MR. FREEDMAN:  I don't think we need to discuss it,

Your Honor.

THE COURT:  I know I've postponed the reporting dates

for lengthy periods of time before, but that's where I land.

MR. FREEDMAN:  Especially if you order he serve his

house arrest portion first.

THE COURT:  Well, I think it's got to -- if I do it

that way, I think the house arrest has got to be a component of

the supervised release, but I think I can flip it around and

1 order that he go ahead and satisfy that to the extent possible,

2 and then hopefully the substantial assistance and other stuff

3 will be wrapped up, and we can address that later.

4         Let's take five minutes and make sure you don't want

5 to be heard further, but I'll be back.

6         MR. CHUT:  Thank you, Your Honor.

7         (Bench conference concluded.)

8         THE COURT:  All right.  We'll stand at ease for five

9 minutes.

10         (At 12:17 p.m., break taken.)

11         (At 12:22 p.m., break concluded.)

12         THE COURT:  All right.  Anything further,

13 Mr. Freedman?

14         MR. FREEDMAN:  May we approach again, Your Honor?

15         THE COURT:  You may.

16         (Bench conference as follows:)

17         MR. FREEDMAN:  We're fine with that.  Two things we

18 would request.  One would be that the sentence should be a year

19 and a day.

20         THE COURT:  What?

21         MR. FREEDMAN:  A year and a day.

22         THE COURT:  I thought about that.  I'm going to

23 decline on that one.

24         MR. FREEDMAN:  Oh, okay.  And the other thing is he

25 travels to -- he goes back and forth from --

US v. Porter - Sentence, Vol 2 - September 18, 2013

1      THE COURT:  He's going to have to make some

2  adjustments.  We'll deal with the travel as we go along.  It's

3  not outside the United States?

4      MR. FREEDMAN:  No, no.

5      MR. WYATT:  He travels.  He's got a camper down in

6  South Carolina.  The weeks he doesn't have Michael, he goes

7  down there because he's got to turn that business around, so he

8  has to be there a week at a time, if possible.

9      THE COURT:  I'm going to give him a little bit of

10 time then.  I'm going to push out the date that he's going to

11 start his electronic monitoring house arrest.  But I'll tell

12 you, to put it in perspective, I really wrestle with what to do

13 here because I think it's a very serious case.  But I'll give

14 him a little time to make an adjustment, and it will be up to

15 Probation on house arrest.  I think, you'll want to talk to

16 Mary Elizabeth Wilkins, they'll let him out to work.  Under the

17 terms -- I mean, I'm going to have it location monitoring house

18 arrest, but the location monitoring is at the discretion of the

19 probation officer.  So to the extent those terms need to be

20 amended, you can ask me later by motion, and the Government

21 will have a chance to respond.

22      MR. FREEDMAN:  Thank you.  We just wanted to point

23 those things out.

24      THE COURT:  All right.  Anything from the Government?

25      MR. CHUT:  No, Your Honor, thank you.

1          (Bench conference concluded.)

2          THE COURT:  All right.  Well, in Mr. Porter's case,

3  as counsel knows, because it's something of an unusual case --

4  you can all have a seat while I go through this part.  I'll

5  impose the sentence later.  I find that a sentence in this case

6  of 24 months to be served 12 months active and 12 months house

7  arrest as a condition of supervised release along with a fine

8  in the amount of $100,000 is sufficient but not greater than

9  necessary.

10          In evaluating the applicable factors in this case,

11  first, looking at the nature and circumstances of the offense,

12  I'll make a limited comment that I am really only able to

13  evaluate the seriousness of the offense based on the evidence

14  presented before me.  In this case previously, we stopped, and

15  there was substantial disagreement as to the facts contained in

16  the presentence report.  There's still some gaps, but I think

17  at this point in time the parties have had sufficient time to

18  present such evidence as they believe appropriate, and I will

19  proceed ahead with the sentencing based upon what's been

20  presented in this case.

21          I find in relation to the nature and circumstances of

22  the offense that this is a very serious offense, regardless of

23  the motive, that is, even if it was limited to an effort to get

24  around the cap imposed by the program H-2B -- H-2A and H-2B

25  programs imposed by the United States specifically,

Mr. Porter's conduct from 2008 to 2010 included submitting
petitions that included false statements as to the number of
workers needed, the type of work the workers would be
performing, and the location at which those workers would
actually work.

In addition, the defendant conducted one financial
transaction in excess of $10,000 with the proceeds of the
criminally derived -- or the proceeds derived from the criminal
activity.  These fraudulent visas were ultimately used to
generate the total amounts as set forth in the spreadsheet,
which I think was ultimately, on a gross amount, about $750,000
a year or thereabouts -- the correct amounts are set out in the
spreadsheet -- and approximately $400,000 in net proceeds
derived from the criminal activity as set forth in the
spreadsheet.

I do feel compelled in light of the arguments to make
one comment that is my -- with respect to the economic
circumstances and the cap as motivating factors in this
activity.  Financial difficulties are not a new experience for
any business.  As anyone knows who reads the paper or watches
television, financial difficulties can be a contributing factor
for some businesses in terms of criminal conduct, but also, I
think, as most of us know anyway, for many other businesses
they simply prompt difficult but honorable decisions to either
close a business or take the extraordinary steps necessary to

1  continue.

2       To excuse Mr. Porter's criminal activity because of

3  the difficult circumstances caused by the cap, at least in my

4  mind, diminishes the choices made by those businesses that

5  choose to follow the law in spite of difficult financial

6  circumstances.  I, therefore, do not find that difficult

7  economic circumstances under the facts of this case mitigate

8  the seriousness of the offense.

9       With respect to the history and characteristics of

10  the defendant, Mr. Porter is 62 years old, has done well for

11  his family, friends, and the community, as evidenced by the

12  facts of this case and from counsel's argument.  As I have

13  stated earlier, it is the belief of this Court that a criminal

14  history category of I at this defendant's age is certainly

15  suggestive that the need to protect the public from further

16  crimes of the defendant and deter the defendant from criminal

17  activity is low, all as argued by the defendant in this case.

18  The defendant's argument that Mr. Porter's personal

19  characteristics as well as his contribution to family and

20  friends merit consideration by this Court on the facts of this

21  case is well-taken argument.

22       In terms of both the seriousness -- the type of the

23  offense and the seriousness of the offense conduct, I find the

24  conduct to be serious and extensive.  As argued by the United

25  States, I find the need to deter the defendant individually to

be low, but I also find the need to deter others similarly situated to be significant.  This offense, like a tax offense, is one in which the Government relies significantly upon truthful and complete responses, particularly in light of the time frames for the application and what appears to the Court from the evidence in the case to be the volume and complexity of the applications submitted for participation in these -- in the respective programs.

In light of all those factors, as I have indicated, I find that a -- what at least arguably is a variant sentence as to the active sentence component downward, that is, splitting the sentence between a halfway house and an active time, I find that variance is appropriate on the facts of this case in light of both Mr. Porter's personal characteristics as well as the extensive nature of the cooperation.  I think I indicated earlier, but I will grant the Government's motion for a departure which would otherwise -- I will put things in perspective -- given his cooperation, I would start at a sentence of 27 months, the low end of the guideline range and then would otherwise depart from that the 20 percent as recommended by the United States.

Here, there is a very significant issue in terms of Mr. Porter's continuing cooperation.  It seems to me the Government is interested in Mr. Porter's continuing cooperation; and in terms of mitigating or rectifying the past

1 criminal conduct, I find that his ability to continue that

2 cooperation with the United States is a significant factor that

3 should be taken into consideration by this Court in fashioning

4 a sentence.

5 So for those reasons, I find that a sentence of 24

6 months to be served in the manner in which I have described is

7 a sentence that is sufficient but not greater than necessary

8 taking into consideration all appropriate circumstances.

9 On the other hand, as I have indicated, I find this

10 to be a very serious offense. While I understand the merits of

11 the argument with respect to proceeds from the illegal activity

12 as well as expenses incurred by Mr. Porter in relation to the

13 business that he was operating at the time, I frankly find in

14 terms of deterring Mr. Porter and others that for Mr. Porter to

15 essentially retain any of those net proceeds of the illegal

16 activity would be improper, and I therefore find that a

17 variance upward with respect to the fine range, which is six to

18 $60,000, to a fine of $100,000 in this case is appropriate and

19 is a necessary component of determining and imposing a sentence

20 that is sufficient but not greater than necessary as is

21 required under 18 USC Section 3553.

22 In light of all those factors, the sentence that I

23 have outlined, that is, a sentence of 24 months with 12 months

24 to be satisfied as a condition of supervised release under a

25 house arrest component and a fine of $100,000, is a sentence

1  that is sufficient but not greater than necessary.

2  I will delay Mr. Porter's reporting date for

3  approximately a year, that is, to September -- I'll make it --

4  I don't know when -- today is Wednesday, so I'm going to make

5  it September 17, 2014, and I'm going to order that Mr. Porter,

6  as a condition of his continuing release, begin his house

7  arrest -- I'm going to say four weeks from today, that is,

8  October the 18th, 2013, and the time served under the halfway

9  house -- I mean, excuse me -- under house arrest between now

10 and the time Mr. Porter reports for service of the active

11 component of his sentence will be credited towards the

12 condition of Mr. Porter's supervised release.

13 That's the sentence I will impose in this case.  A

14 $200 special assessment in total.  Mr. Freedman, anything

15 further you wish to address at this point?

16 MR. FREEDMAN:  No, Your Honor.

17 THE COURT:  Mr. Chut, anything further the Government

18 wishes to address?

19 MR. CHUT:  Your Honor, I think the Court needs to

20 mention the forfeiture, Your Honor, and is the fine due and

21 payable immediately, Your Honor?

22 THE COURT:  I will -- the fine will be due and

23 payable immediately, and I will -- Mr. Porter has paid the

24 $300,000 forfeiture.  I'll enter a final order of forfeiture.

25 Is the Government going to hand up a written order to that

1  effect, Ms. Klauer?

2      MS. KLAUER:  Your Honor, the final order has already

3  been entered.  Preliminary final orders have been entered, but

4  for inclusion in the judgment.

5      THE COURT:  I will note the judgment should include

6  notice of the final order of forfeiture and satisfaction of the

7  $300,000 order of forfeiture.

8      All right.  Mr. Porter, if nothing further, if you

9  will stand then.  In Case No. 1:13CR47-1, United States versus

10  Stanley Scott Porter, as to Count One of the Bill of

11  Information, it is hereby ordered that the defendant is

12  committed to the custody of the Bureau of Prisons for a term of

13  12 months to be followed by three years of supervised release.

14  A special assessment of $100 is mandatory, is hereby imposed,

15  and is due and payable immediately.  A fine in the amount of

16  $100,000 is hereby imposed and is due and payable immediately,

17  and restitution is not applicable in this case.

18      As to Count Two of the Bill of Information, it is

19  hereby ordered that the defendant is committed to the custody

20  of the Bureau of Prisons for a term of 12 months.  That

21  sentence is imposed to run concurrently with the sentence

22  imposed as to Count One followed by three years of supervised

23  release which shall run concurrently.  A $100 special

24  assessment is hereby imposed as to Count Two as well for a

25  total of $200 in special assessments in Mr. Porter's case.

During the period of supervised release, it is
ordered that the defendant shall comply with the standard terms
and conditions of supervised release.  In addition to the
standard terms and conditions, the following special conditions
are imposed:

One, the defendant shall provide any requested
financial information to the probation officer.

Two, the defendant shall not incur new credit charges
or open additional lines of credit without the approval of the
probation officer.

And, three, a fine in the amount of $100,000 is due
and payable immediately.  In the event the entire amount of
criminal monetary penalties imposed is not paid prior to the
commencement of the term of supervised release, the defendant
shall make payments in equal monthly installments of $500 to
begin 30 days after the commencement of the term of supervised
release and continuing during the entire term of supervised
release, or until paid in full.

And, four, the defendant shall notify the Probation
Office in any material change in his economic circumstances
that may affect his ability to pay restitution, a fine, or the
special assessment.

Five, the Court orders that the defendant abide by
all the terms and conditions of the location monitoring home
detention program for a period of 12 months.  At the direction

1   and the discretion of the probation officer, the defendant may

2   be ordered to wear a location monitoring device which may

3   include GPS or other monitoring technology and follow all

4   program procedures specified by the probation officer.  Payment

5   for the location monitoring services will be made by the

6   defendant at the direction of the Probation Office.

7           The Court -- I think I've got to do it two ways.  The

8   Court will direct in the final judgment that this condition of

9   12 months house arrest may be satisfied -- or will be satisfied

10  by the defendant as a -- beginning October the -- October 18th,

11  2014.  The Court will modify the terms and conditions of

12  pretrial release to reflect that condition, and for any time

13  the defendant serves the condition of house arrest while

14  awaiting designation of the active sentence component and

15  reporting to an institution will be credited toward this

16  condition of supervised release.  I will also modify the terms

17  and conditions of release under which Mr. Porter is presently

18  serving to reflect that beginning October the 18th, 2013, the

19  defendant is ordered to abide by -- October 18, 2013, the

20  defendant is to abide by all the terms and conditions of the

21  location monitoring house arrest program as set forth in the

22  supervised release conditions.

23          The Court does order that the judgment reflect -- the

24  final judgment entered with respect to the $300,000 forfeiture

25  judgment as well as a credit to Mr. Porter for the moneys paid

1  as to that forfeiture amount.  Did I cover everything?

2          MR. FREEDMAN:  A reporting date.

3          THE COURT:  Oh, I'm going to set the reporting date

4  for service of the active sentence as -- I would like to keep

5  them on Wednesday.  I think that will be -- does that mean it

6  will be the 17th or the 19th?  The 17th next year.

7  September 17th, 2014, at 12:00 noon to the institution

8  designated by the Bureau of Prisons or to the United States

9  Marshal Service on that day.

10         Mr. Porter, you do have the right to appeal the

11 sentence that I have imposed in this case.  If you choose to

12 appeal, notice of appeal must be filed within 14 days of the

13 entry of judgment.  If you wish to appeal and cannot afford the

14 services of counsel, counsel will be appointed to represent

15 you.  Mr. Freedman and Mr. Wyatt will advise you with respect

16 to your right to appeal and file a notice of appeal if you

17 instruct them to do so.

18         Anything further, Mr. Wyatt, Mr. Freedman?

19         MR. WYATT:  No, Your Honor.

20         MR. FREEDMAN:  No, Your Honor.

21         THE COURT:  Mr. Chut?

22         MR. CHUT:  No, Your Honor.  Thank you, Your Honor.

23         THE COURT:  Mr. Porter, I certainly appreciate your

24 cooperation, but I think as this indicates and as my comments

25 may have indicated throughout, I find this to be a very serious

1    offense.  But I do appreciate the work you have done since the

2    discovery of this offense, and good luck to you, sir.  All

3    right.  That concludes this matter.  Thank you.

4              MR. WYATT:  Thank you, Your Honor.

5              THE DEFENDANT:  Thank you.

6              (At 12:41 p.m., proceedings concluded.)

7                          * * * * *

8                     C E R T I F I C A T E

9         I certify that the foregoing is a correct transcript
          from the proceedings in the above-entitled matter.

10

11

12    Date: 05/27/2014       Joseph B. Armstrong, RMR, FCRR
                             United States Court Reporter
13                           324 W. Market Street
                             Greensboro, NC  27401
14

15

16

17

18

19

20

21

22

23

24

25

US v. Porter - Sentence, Vol 2 - September 18, 2013